UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

RICKEY A. JONES,
        Plaintiff,

v.

NEW ENGLAND CENTRAL RAILROAD, INC.,
        Defendant.

Civil Action No.: 04-11772-MAP

### NEW ENGLAND CENTRAL RAILROAD, INC.'S MOTION IN LIMINE TO PRECLUDE THE PLAINTIFF FROM PRESENTING A THEORY OF LIABILITY BASED ON THE EVENTS SURROUNDING INJURIES HE SUSTAINED ON JULY 14, 2003 AND FOR A PRE-TRIAL INSTRUCTION ON THIS ISSUE

    The New England Central Railroad, Inc. ("NECR") moves, *in limine,* seeking an order from this Honorable Court to preclude the plaintiff from presenting a theory of liability based upon the events surrounding injuries he sustained on July 14, 2003. The NECR also requests that this Honorable Court instruct the jury, at the outset of the case, that any finding of liability cannot be based on the events of July 14, 2003. As grounds therefore, the NECR states that both the plaintiff and his counsel have stated on the record during the plaintiff's deposition that the plaintiff has no claim against the NECR based upon the happening of his injury on July 14, 2003. The NECR has relied upon those admissions and representations and has prepared its defense accordingly and would be severely prejudiced should the plaintiff and his counsel advance such evidence and/or theory at trial.

    The plaintiff is basing his claims in this litigation on an incident which occurred on August 15, 2002, when he allegedly fell from a railroad tank car and injured his right knee. *See* the transcript of the plaintiff's deposition, a copy of which is attached as Exhibit "A," at p. 151-

152, 154. The plaintiff recovered from this injury and returned to work on March 24, 2003. Id. at p. 215. From March 24, 2003 until July 14, 2003, the plaintiff worked his full shifts and overtime, and he was able to perform the full duties of his job. Id. at p. 225.

On July 14, 2003, eleven months after the incident involving this litigation, the plaintiff injured himself once again as he stepped off a railcar and his right knee pinched and buckled. Id. at p. 235. The plaintiff did not make a report of this injury, because "there was nothing to report" to the company as there was no defective condition involved. Id. at p. 236-237. The plaintiff and his counsel state that his claims in this litigation begin and end with the events surrounding the August 15, 2002 incident and are not based on anything that may or may not have occurred on July 14, 2003. Id. at p. 237-238. Therefore, the plaintiff must be precluded from arguing that the NECR is liable to him for injuries sustained on July 14, 2003 or from presenting a theory of liability to the jury in this regard.

In addition, in order to avoid any confusion, misleading of the jury or undue prejudice, the jury must be instructed that they cannot find liability based on the happening of the July 14, 2003 injury.

WEHEREFORE, for all of the above-stated reasons, the defendant's motion should be allowed.

>Respectfully submitted,
>
>The defendant,
>
>NEW ENGLAND CENTRAL RAILROAD, INC.,
>
>by its attorneys,
>
>/s/ Michael B. Flynn
>
>Michael B. Flynn     BBO #559023
>Valerie A. Murphy     BBO #661460
>FLYNN & ASSOCIATES, P.C.
>400 Crown Colony Drive, Suite 200
>Quincy, MA 02169
>(617) 773-5500

Dated: July 21, 2006
G:\F & A\CASE FILES\RAILAMERICA\New England Central\JONES, RICKEY A\pleadings\Motion in Limine - July 2003.doc

# Exhibit "A"

Volume I, Pages 1-319

Exhibits 1-11R

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

RICKEY A. JONES                         \*

       Plaintiff               \*

VS.                                     \* No. 04-11772-MAP

                                         \*

NEW ENGLAND CENTRAL RAILROAD, INC.\*

       Defendant               \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    DEPOSITION OF:  RICKEY A. JONES

      FLYNN & ASSOCIATES, P.C.

    400 Crown Colony Drive, Suite 200

       Quincy, Massachusetts

  November 1, 2005    9:30 a.m.-3:50 p.m.

-----REPORTED BY: CHRISTINE SILVA-ADERMANN/RPR-----

       BEACON HILL REPORTING

      44 Bayswater Street

     Boston, Massachusetts

  617.569.8050    Fax 617.569.8150

Rickey A. Jones
November 1, 2005

(Pages 150 to 153)

**150**

1  A. Could be.
2  Q. Consistent with your memory?
3  A. Give or take.
4  Q. Give or take an inch or two?
5  A. Something like that.
6  Q. Does your left foot ever reach the bottom
7  stirrup?
8  A. Yes, sir.
9  Q. Then what happens next?
10 A. I got, just about the time I got all my
11 weight into it, I went to lower my right leg into
12 the ground. And my foot slipped out of the stirrup,
13 and I couldn't catch it because my hands were
14 sliding down the pole. I don't know what you call
15 it. It's not a grabber.
16 Q. So now you are moving your right foot down
17 to try to get to the ground?
18 A. Yes, sir.
19 Q. That's where you intended to put your right
20 foot?
21 A. Yes, sir.
22 Q. You are stepping backwards; correct?
23 A. Yes, sir.
24 Q. And at that point in time, your left foot

**151**

1  slips right out of the stirrup?
2  A. Yes, sir.
3  Q. And your right foot hits the ground?
4  A. Yeah. My hands slid down the pole, and I
5  couldn't catch myself. I landed on the right foot
6  kind of behind me.
7  Q. Your right foot was the first part of your
8  body that hit the ground?
9  A. Yes, sir.
10 Q. And what happened next?
11 A. I laid there for a while. I don't know.
12 If felt like forever. Mr. Cobb called and asked if
13 I was all right. I think I told him to give me a
14 minute.
15 Q. What does slurry look like, by the way?
16 A. Talcum powder when it's dry.
17 Q. White?
18 A. Yeah. It basically is talcum powder.
19 Q. Describe the mechanics of what happened to
20 your right leg when it hit the ground?
21 A. It folded underneath me. It hurt. All I
22 was worried about was getting it out from underneath
23 me.
24 Q. So it folded underneath you?

**152**

1  A. Yes, sir.
2  Q. So you came down almost like -- you know
3  what Indian-style sitting is, where you cross your
4  ankles in front of you and your knees go out to the
5  side? You never heard of sitting Indian-style?
6  A. No. I live by reservations.
7     MR. MYERS: I guess they have chairs.
8     MR. FLYNN: Probably do now.
9  Q. So did your knee move outward from your
10 body, inward, what happened to it?
11 A. I don't really know. I know wherever I
12 rested, it was out on the side of my leg.
13 Q. Can you show me with your good knee?
14 A. The good knee ain't good no more. It
15 folded when I hit. My leg was back like this. And
16 when it popped, this folded back this way.
17 Q. So your knee was bent at 90 degrees as
18 you're showing me there?
19 A. No. I was getting down off the car it
20 should have been almost straight.
21 Q. It was almost straight, okay. And did it
22 buckle back, or did it bend as it usually does?
23 A. It should have bent as it usually does.
24 Q. What happened to you is what I'm trying to

**153**

1  figure out? The mechanics are very important.
2  A. The only way I could because I was going
3  backward from the slide.
4  Q. So you hit it, you kind of went straight
5  down?
6  A. My foot planted and my body followed
7  through.
8  Q. Backwards?
9  A. Correct.
10 Q. Was there any twisting involved in the
11 mechanism?
12 A. Don't know.
13 Q. Not that you can recall anyway?
14 A. No, sir.
15 Q. When you fell, you fell with your head away
16 from the tracks and your feet pointed towards the
17 tracks?
18 A. I don't really remember that. I know I
19 wasn't in the gauge.
20 Q. You were outside of the railroad ties?
21 A. Yes.
22 Q. You weren't in danger of being run over by
23 the train at all?
24 A. No, sir.

Rickey A. Jones
November 1, 2005

(Pages 154 to 157)

**Page 154**

1  Q. So what position was your right leg in at
2  that time when you were on the ground?
3  A. It was folded up beside my thigh.
4  Q. Folded up beside your thigh. Where was
5  your foot? Was your foot underneath?
6  A. It was by my hip.
7  Q. Your foot was by your hip?
8  A. Yes, sir.
9  Q. Was it underneath your body?
10 A. To the outside.
11 Q. To the outside of your right hip?
12 A. Yes, sir.
13 Q. Kind of like in this position almost I'm
14 demonstrating for you now?
15 A. Yes.
16 Q. I'm holding, for the record, I've got my
17 knee fully bent and my foot up by my right buttock;
18 right?
19 A. It was by my hip. My foot was flat.
20 Q. It was in an unnatural position?
21 A. Yes, sir.
22 Q. What did you do next?
23 A. I laid there for a little while. Nathaniel
24 Cobb got off the engine to check on me. I asked him

**Page 155**

1  to give me a hand to get up.
2  Q. Did you call him to help you?
3  A. No, sir.
4  Q. You just laid there for a while?
5  A. Tried to gather myself.
6  Q. About how long did that take?
7  A. I really can't say. It felt like forever.
8  Q. Did you try to get up?
9  A. By myself initially I did, but I couldn't.
10 Q. When Mr. Cobb got there, did he help you?
11 A. Yes, sir.
12 Q. Did you -- what did you do next?
13 A. I checked my knee out, noticed it was
14 swelling. I wanted to see if I could finish out the
15 night.
16 Q. Do you remember giving a statement in this
17 case?
18 A. I don't remember it.
19 Q. Do you remember giving a statement though?
20 A. No, sir.
21 Q. Are you aware that you did?
22 A. I've seen some documentation.
23 Q. You've seen a transcript of a statement you
24 gave?

**Page 156**

1  A. I think the railroad gave me a copy.
2  Q. And it was a recording that was made of
3  your statement that you gave to a gentleman named
4  Dick Ogden?
5  A. Oh, no, I haven't seen that.
6  Q. You haven't seen that?
7  A. No, sir.
8  Q. You do remember speaking to a gentleman
9  named Dick Ogden?
10 A. Vaguely. I remember the second time. The
11 first time I don't really remember.
12 Q. Are you saying that you don't recall that
13 at all taking place?
14 A. Bits and pieces, not most of it.
15 Q. You do at least recall it took place?
16 A. Yes, sir.
17 Q. He made a tape recording of the statement
18 that you gave; right?
19 A. I'm aware he did that.
20 Q. Do you recall in this statement talking
21 about a rip in your pants right at the knee?
22 A. Yes, sir.
23 Q. And a cut that you had on your knee?
24 A. It was a scrape, I think.

**Page 157**

1  Q. You remember it was bleeding; right?
2  A. A little bit.
3  Q. Do you know how that occurred?
4  A. I do not have the foggiest idea because
5  there was nothing around that could cut me that I
6  thought. I don't know if it had rolled under and
7  got hung up on some rocks when I hit the ground.
8  Q. You remember it was there, but you don't
9  remember how it happened?
10 A. Correct.
11 Q. Do you remember looking at the car when Mr.
12 Cobb came down?
13 A. No, I don't.
14 Q. Do you remember looking at the car and
15 seeing it, coming to the conclusion that there was
16 nothing wrong with the car?
17 A. No.
18 Q. You don't remember one way or the other?
19 A. I really wasn't interested in the car at
20 that point in time.
21 Q. Well, you fall from the car; correct?
22 A. Yeah.
23 Q. You are injured; right?
24 A. Correct.

40

Rickey A. Jones
November 1, 2005

(Pages 214 to 217)

**214**

1  as Exhibit 9. This is a portion of the discharge
2  note from your discharge summary from Rehabilitation
3  Services At Northwest Medical Center.
4      MR. MYERS: Which one is it? What's the
5  date?
6      MR. FLYNN: Signed on June 9, 2003. But
7  it's talking about a discharge which occurred -- or
8  event which occurred March 14, 2003.
9      (Marked, Exhibit 9, Portion of Discharge
10 Note)
11     MR. MYERS: Can you read it?
12  A. Yeah. It kills my head though.
13     MR. MYERS: Would these help you.
14  A. No. I'll go blind.
15  Q. Have you had a chance to look at Exhibit 9?
16  A. Yes, sir.
17  Q. Therapist note there was that on March 14,
18 2003 you demonstrated no difficulty jumping from a
19 static position and you were able to step up and off
20 a 20-inch step and that you had judged that this was
21 the average height you had to negotiate at work.
22 Did I read that correctly?
23  A. Yes, sir.
24  Q. Do you recall that that actually occurred

**215**

1  at the end of your physical therapy sessions
2  following the first surgery?
3  A. Yes.
4  Q. Then you actually stated that you were
5  planning on returning to work; correct?
6  A. Yes, sir.
7  Q. Not that Dr. Beattie released you to work
8  but you planned on returning to work?
9  A. He released me.
10  Q. You felt you were able to do so; correct?
11  A. I felt he felt I was able to do so.
12  Q. You did go back to work?
13  A. Either that or be fired.
14  Q. You continued to work for four months
15 afterwards?
16  A. I don't really know.
17  Q. You went back on March 24, 2003; right?
18  A. Yes.
19  Q. Then you were injured again in July of
20 2003; correct?
21  A. Yeah.
22  Q. Are you saying you only went back to work
23 because you had to?
24  A. Yes, sir.

**216**

1  Q. You wouldn't have gone back to work if you
2  had your choice?
3  A. No, sir.
4  Q. You're saying you were forced back to work
5  by the railroad?
6  A. I'm saying I felt like I was forced back.
7  Q. How were you felt like you were forced
8  back?
9  A. Either work or get fired. I mean, I don't
10 have any other skills.
11  Q. Did anyone at the railroad communicate that
12 to you?
13  A. Charlie Moore had actually come up and told
14 me I was a liar.
15  Q. What did he say you were lying about?
16  A. He told me I didn't get hurt on the job, I
17 got hurt off the job. And I don't want to use the
18 exact terminology here.
19  Q. I think you do. What did he --
20  A. He called me a fucking liar.
21  Q. When did that occur?
22  A. Right after I got hurt.
23  Q. After the August 15, 2002 incident?
24  A. Yeah. Probably around October/November of

**217**

1  the same year.
2  Q. You hadn't returned to work at that point
3  in time?
4  A. I went up to see him because he was the
5  vice president.
6  Q. What did you go up to see him about?
7  A. He was going to -- he was asking me how I
8  was doing.
9  Q. Why did you go see him? That's the first
10 question.
11  A. I wanted to maintain some sort of relations
12 with the company. I didn't hate the company. I
13 really enjoyed working there. And from that point
14 on I knew where I stood.
15  Q. Wait a minute. First question is why did
16 you go see him? Just to keep in contact with the
17 company?
18  A. Yeah. I'd go up to the office building and
19 talk to some of the guys in charge. And run into
20 Charlie Moore.
21  Q. Just one time you ran into him, or were
22 there other times?
23  A. No. I dodged him after that.
24  Q. This was the one time he called you a liar?

Rickey A. Jones
November 1, 2005

(Pages 222 to 225)

**222**

1    A. At a wedding I think it was. I think it
2  was at her wedding.
3    Q. Her wedding? You were there?
4    A. Yes, sir.
5    Q. Was there a video made of that wedding?
6    A. I don't know.
7    Q. This was after your accident?
8    A. The wedding -- I think it was just after
9  the accident or just before.
10   Q. After which one, the August 15 or July '03?
11   A. There was no accident on July '03.
12   Q. Okay. It was after the August 15 incident?
13   A. Yes, sir.
14   Q. Was it before the July '03 incident?
15   A. It had to be before that.
16   Q. Have you attended any other weddings since
17 August 15, 2002?
18   A. Couldn't get around.
19   Q. My question is did you attend any weddings
20 other than that one?
21   A. Yeah, I did.
22   Q. Whose other weddings did you attend?
23   A. My best friend got married.
24   Q. Were you in the wedding party?

**223**

1    A. Yeah.
2    Q. Were you the best man?
3    A. Yes, sir.
4    Q. What was his name?
5    A. Ryan Cotton.
6    Q. Ryan Cotton?
7    A. Yes, sir.
8    Q. Where does he live?
9    A. Georgia.
10   Q. Whereabouts?
11   A. Warrenton.
12   Q. Do you know the address?
13   A. I don't know the address. I call him. I
14 know how to drive to his house.
15   Q. Is there a video of that wedding?
16   A. I don't know.
17   Q. Do you have a copy of it?
18   A. Me, no.
19   Q. When was that wedding, when did that occur?
20   A. Late November. I think it was November 30.
21   Q. Of '04?
22   A. No, sir. Of '03.
23   Q. So let me see if I got this straight.
24 Based on your understanding of what happened to Mr.

**224**

1  Smith, based on what he and his daughter told you,
2  you drew the conclusion from that that if you didn't
3  go back to work once your doctor cleared you to go
4  back to work, you would have been fired?
5    A. Yes, sir.
6    Q. You felt that you weren't able to go back
7  to work, but because of that fear you decided to do
8  that anyway?
9    A. Correct.
10   Q. No one from the railroad told you that once
11 you were cleared medically to go back to the work
12 you would be fired if you did not; correct?
13   A. I don't really know what you are saying.
14   Q. I'm not saying anything. I'm asking you
15 did anyone from the railroad point-blank tell you
16 that?
17   A. Point-blank, no.
18   Q. Was there any some kind of a toose
19 (phonetic) reference made from somebody from the
20 railroad?
21       MR. MYERS: What reference?
22   Q. Was there a vague reference made?
23   A. You can ask anyone who works there Charlie
24 Moore will tell you it's his way or the highway.

**225**

1  That's the way he runs his shop.
2    Q. And he told you if you didn't come back to
3  work once the doctor said you'd be able to, you
4  would be fired?
5    A. He didn't have to. The conversation we had
6  prior to was enough.
7    Q. Once you went back to work in March of '03,
8  you did not miss any time until the July 14, 2003
9  incident; is that fair to say?
10   A. Correct.
11   Q. You worked your full shifts; correct?
12   A. Correct.
13   Q. You worked some overtime; correct?
14   A. Probably.
15   Q. At the time of your first incident August
16 2002, were you regularly participating in
17 recreational activities?
18   A. Regularly, no.
19   Q. Do you have an ATV?
20   A. No.
21   Q. Did you have a motorcycle?
22   A. No.
23   Q. Did you do any four-wheeling offroad stuff?
24   A. No, sir.

Rickey A. Jones
November 1, 2005

(Pages 234 to 237)

**234**

1    A. Probably. Because the drains just hard to
2 come by, I mean, the smell is atrocious.
3    Q. Now, you had an incident on July 14, 2003?
4    A. What is that?
5    Q. Well, something occurred on July 14 of
6 2003. Did you reinjure yourself?
7    A. It had been hurting. It wasn't a
8 reoccurrence. It was, you know, it buckled like
9 normal, and I just couldn't go on.
10   Q. That was happening to you on a regular
11 basis?
12   A. Ever since I went back to work, well, about
13 a month, month and a half after I went to work.
14   Q. Was that happening to you off the job as
15 well?
16   A. No. Because I didn't really move around.
17 My leg was dead.
18   Q. When you were home, you were sitting
19 around?
20   A. I was lethargic.
21   Q. When you were at work, you had to move
22 around because it was part of your job?
23   A. Yes, sir.
24   Q. It was the condition of moving around that

**235**

1 caused you to have pain; correct?
2    A. Yes, sir.
3    Q. From time to time your knee would buckle?
4    A. Yes, sir.
5    Q. That had nothing to do with the condition
6 of the ground underneath your feet; is that fair to
7 say?
8    A. Sometimes it did. If I stepped wrong into
9 the oil and my foot slid out from under me, it's
10 going to buckle regardless.
11   Q. Is that what happened on July 14, 2003 or
12 was it simply walking and your knee buckled on you?
13   A. I think actually I was coming off a car and
14 when my foot hit the ground put weight on it, it
15 buckled. I know it was 104. I can't remember if I
16 was coming off a car or walking down 104.
17   Q. Do you recall giving Mr. Ogden a statement
18 with respect to that incident?
19   A. Yes, sir.
20   Q. That was only a few days after the incident
21 occurred?
22   A. I do remember that.
23   Q. Were you on pain medications at that point
24 in time?

**236**

1    A. No. They made loopy prior to. I didn't
2 want to take them anymore.
3    Q. When did you stop taking pain medication?
4    A. Well, before I went back to work.
5    Q. You weren't taking them as of the date of
6 that incident, were you?
7    A. No.
8    Q. You weren't taking them at the time you
9 gave a statement to Mr. Ogden?
10   A. Which time?
11   Q. The second statement?
12   A. No, sir, I wasn't.
13     MR. MYERS: I need to take a break.
14     (Break taken)
15   Q. July 14, 2003, sir, you remember in that
16 statement to Mr. Ogden that you gave following that
17 incident that you told him there was nothing unusual
18 about the yard and the area where you had this
19 incident and that your knee simply pinched and
20 buckled underneath you; do you remember telling him
21 that?
22   A. Yeah. It was nothing unusual. It was the
23 same.
24   Q. So there wasn't any defective condition

**237**

1 there, was there?
2    A. Not that I can remember.
3    Q. Okay. In fact, you didn't report any
4 defective condition, did you?
5    A. No.
6    Q. In fact, you didn't make any report of this
7 condition at all, did you?
8    A. Actually I talked to Steve Larro in the
9 yard or around the yard talking on the radio.
10   Q. You didn't make any written report of the
11 incident, did you?
12   A. I was not asked to.
13   Q. You remember telling Mr. Ogden in your
14 statement the reason you didn't make out a written
15 report was because there was, quote, "nothing to
16 report," end of quote?
17   A. There wasn't.
18   Q. Right. There wasn't, you agree with that?
19   A. Yeah, I agree.
20   Q. There wasn't any hole or piece of scrap
21 iron or something that you stepped on that wasn't
22 supposed to be there?
23   A. No. It was reoccurring from the August 15.
24   Q. Okay.

Rickey A. Jones
November 1, 2005

(Pages 238 to 241)

**238**

1  MR. MYERS: We're not asserting a
2  separate accident of July of '03, just to make clear
3  so you're okay and we're not --
4  MR. FLYNN: Your claim in this case,
5  Bob, is that it all begins and ends with the August
6  15, 2002 accident; correct?
7  MR. MYERS: That's the date of the onset
8  of the injury and the symptoms. Whether it caused
9  or exacerbated a different condition, that's a whole
10 other issue.
11 MR. FLYNN: I understand. But you are
12 not claiming there is any liability on the railroad
13 for what was there on July 14, 2003?
14 MR. MYERS: Correct. That is not a
15 separate incident.
16 Q. After this July 14, 2003 incident, you
17 started seeing Dr. Beattie for injections of a
18 substance called hyalogen?
19 A. I think it's pronounced hyalogen, and that
20 was his assessment of the situation.
21 Q. He did do those injections for you for a
22 couple of weeks after the accident; right?
23 A. I don't know how many shots there were. I
24 think it might have been three or five.

**239**

1  Q. They didn't help you, did they?
2  A. No.
3  Q. The injection was a protein substance which
4  is designed to grow cartilage and tendon; is that
5  fair to say?
6  A. Yeah. They make it out of a rooster shoot.
7  MR. MYERS: A rooster what?
8  A. A rooster shoot. The cone on a rooster's
9  head.
10 Q. And an MRI was done, and it didn't show any
11 tears or degenerative changes in your knee?
12 A. That I don't remember.
13 Q. The last time you saw Dr. Beattie was in
14 August of 2003, the last time, which was
15 coincidentally the last time he injected your knee
16 with hyalogen; correct?
17 A. Probably.
18 Q. Was your knee at this point in time feeling
19 the same as it had following August 15, 2002, or was
20 this something different now that you were
21 experiencing?
22 A. It hurt. But it wasn't as bad as the 15th.
23 It was mainly unstable was my biggest complaint
24 walking up and down stairs.

**240**

1  Q. The last day you worked for New England
2  Central was July 14, 2003?
3  A. Yes.
4  Q. Why was it that you stopped working after
5  that day?
6  A. I got to where every time I got home, I
7  couldn't do anything. My leg hurt so damn bad. And
8  it would swell every day.
9  Q. So you are saying that your knee gradually
10 got worse to the point where middle of July came and
11 you just couldn't take it anymore?
12 A. Yes.
13 Q. Do you recall though that your last day of
14 treatment was about a month after this incident?
15 Withdraw the question.
16 The first time you saw Dr. Beattie after
17 July 14, 2003 was about two weeks later on July 30,
18 2003; correct?
19 A. I think it was something -- no. I think I
20 had an appointment, and I was supposed to have had
21 an appointment a couple of days from July 14. I
22 think they cancelled it or something. I had to
23 reschedule.
24 Q. And you didn't get back to see him until

**241**

1  July 30?
2  A. The only one they had was a couple of weeks
3  away.
4  Q. You stopped working in those two weeks?
5  A. Honestly I called in two sick days. By the
6  time I got home, Brad Ovitt called and told me do
7  not come back into work, you have been taken off the
8  roster.
9  Q. You were still being paid then; correct?
10 A. At that point, I don't know. I think it
11 was a week or two and that other thing, whatever
12 they did there, it kicked in.
13 Q. We'll talk about that in a second. Our
14 records show that there was a gap in treatment from
15 August 13, 2003 when you last saw Beattie until
16 January 6, 2004. Do you recall getting any medical
17 treatment from anybody during the end of the summer,
18 fall and beginning of the winter 2003/2004?
19 A. No. I did not. I tried but couldn't.
20 Q. What do you mean tried?
21 A. Nobody would get me a doctor. I tried to
22 get a doctor's appointment. They told me I had to
23 have the company or the whatever Ogden was. It was
24 --