UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

RICKEY A. JONES,
            Plaintiff,

    v.                                          Civil Action No.: 04-11772-MAP

NEW ENGLAND CENTRAL RAILROAD,
INC.,
            Defendant.

## NEW ENGLAND CENTRAL RAILROAD, INC.'S MOTION IN LIMINE TO ADMIT APPORTIONMENT EVIDENCE

The New England Central Railroad, Inc. ("NECR") moves in limine to be permitted to admit evidence of the plaintiff's pre-accident and post-accident medical conditions. The NECR also requests that this Honorable Court instruct the jury on: (1) the apportionment of damages between the injuries due to the subject incident and the pre-existing and subsequently-developed medical conditions; (2) the extent to which the accident in question aggravated and/or exacerbated the pre-existing condition; and (3) the extent that the post-accident condition affects the plaintiff's present condition.

## I.    FACTUAL BACKGROUND:

The plaintiff claims in this lawsuit that on August 15, 2002 he injured his right knee as the result of a fall from a railroad tank car. However, before and since August 15, 2002, the plaintiff suffered from other serious conditions and injuries to the very same part of his body. Specifically, in 1998 he developed patellar femoral syndrome[1] in his right knee while in training to become a Marine. This condition led to the plaintiff's being medically disqualified and

---

[1] Patellar femoral syndrome is a condition which results in the separation of a muscle attached to the knee cap which causes the knee cap to articulate improperly with the femur causing pain and discomfort and, ultimately, degenerative changes.

discharged from the Marines. *See* transcript of the plaintiff's deposition, a copy of the relevant portions of which are attached as Exhibit "A," at p. 23-33. Notably, the plaintiff is now claiming to be disabled due to patella femoral injuries and degenerative osteoarthritis of the right knee. *See* report of Dr. Mikolajczak, plaintiff's medical expert, a copy of which is attached as Exhibit "B."

On June 9, 2002, nearly two months before the date of the incident which is the subject of this litigation, the plaintiff again injured his right knee while playing volleyball, an injury for which he sought medical care and treatment at Northwest Medical Center. Exh. "A" at p. 104-107; *see also* ER Report attached as Exhibit "C". The plaintiff missed two weeks from work due to the volleyball injury and was required to use crutches. Exh. A at p. 107. The plaintiff was diagnosed with a right knee sprain. Id. at p.109. At the hospital on June 10, 2002 the plaintiff was unable to straighten his right knee due to his injury playing volleyball the previous day. Id. at p. 113.

Following the August 15, 2002 incident the plaintiff was diagnosed with a tear of the meniscus and anterior cruciate ligament ("ACL"). Id. at p. 207. The plaintiff then underwent a reconstruction of his ACL and a meniscectomy at which time it was found that the plaintiff suffered from arthritis in the area where his femur contacted the patella  - the same area affected by the plaintiff's pre-existing patellar femoral syndrome. Id. at p. 208-209. The plaintiff recovered after physical therapy and returned to work on March 24, 2003. Id. at p. 215. From March 24, 2003, until July 14, 2003, the plaintiff worked his full shifts and overtime and was able to fully perform the duties of his job. Id. at p. 225.

On July 14, 2003, eleven months after the incident which is the subject of this lawsuit, the plaintiff injured himself once again. He was simply walking in the St. Alban's railroad yard

2

when his right knee pinched and buckled. Id. at p. 236. The plaintiff never reported this injury

to NECR, because there was no defect nor negligence involved, a fact which he has admitted in

his deposition. *See* Exh. A at p. 237; *see also Defendant's Motion in Limine to Exclude Plaintiff*

*from Claiming Liability Based on Events Surrounding his Injuries Sustained July 14, 2003.*

## II.    DISCUSSION OF LAW:

**A.    An FELA Defendant is Entitled to Present Evidence Regarding a Plaintiff's Pre-
existing and Subsequently Developed Medical Condition and is also Entitled to a
Jury Instruction on the Apportionment Between these Conditions and the Injuries
Allegedly Caused By the Incident Which is the Subject of the Plaintiff's Lawsuit:**

It is a longstanding tenant of FELA jurisprudence that a railroad defendant is entitled, as

a matter of law, to present evidence on a plaintiff's pre-existing medical conditions and

accidents, and also to have the jury be instructed that it is to apportion the damages by allocating

a percentage to the plaintiff's pre-existing conditions and prior accidents, and to have the

plaintiff's damages reduced by the amount of this allocation. *See, e.g.* Stevens v. Bangor and

Aroostook Railroad Company, 97 F.3d 594, 601-602 (1st Cir. 1996); Harris v. Illinois Central

Railroad Co., 58 F.3d 1140, 1144-1145 (6th Cir. 1995); Sauer v. Burlington Northern Company,

106 F.3d 1490, 1495 (10th Cir. 1996); Varhol v. National Railroad Passenger Corp., 909 F.2d

1557, 1564-1565 (7th Cir. 1990); Akers v. Norfolk and Western Railway Co., 417 F.2d 632 (4th

Cir. 1969); Holladay v. Chicago, Burlington and Quincy Railroad Co., 255 F. Supp. 879, 886

(S.D. Iowa, 1966).

It is established FELA law in the First Circuit that "when a defendant's negligence

aggravates a plaintiff's pre-existing health condition, the defendant is liable only for the

additional increment caused by the negligence and not for the pain and impairment that the

plaintiff would have suffered even if the accident had never occurred."    Stevens, 97 F.3d at 601.

Several circuit courts of appeal have upheld jury instructions requiring the apportionment of pre-

existing injuries. *See, e.g.* Stevens, 97 F.3d at 601 (the plaintiff in Stevens suffered from

degenerative disc disease similar to the plaintiff's condition here); Varhol, 909 F.2d at 1565 (the

jury instruction read, in part, "if you find that there was such an aggravation, you should

determine what portion of plaintiff's present condition resulted from the aggravation and make

allowance in your verdict only for the aggravation."); Sauer, 106 F.3d at 1495 ("one of the pre-

existing condition instructions told the jury to reduce the damages by the likelihood that Sauer

would eventually have suffered the injury even if the accident had not occurred.... [this

instruction] was a correct statement of the law."); Akers, 417 F.2d at 632 (instruction protecting

the defendant against any award of damages "for any condition existing prior to the alleged

injury for which [the railroad] was not in any way responsible in causing or aggravating" was

upheld); *see also* Holladay, 255 F. Supp. at 886 (An injured party is entitled to recover all of the

damages proximately caused by the negligence of another, including "damages for aggravation

of a pre-existing condition. He is not, however, entitled to recover for damages which would

have resulted from his previous condition without the aggravation.").

The plaintiff here suffered from pre-existing conditions which were not only disabling

but also were likely to continue to get progressively worse over time. Also, he was injured anew

in July 2003, after returning to work without restrictions from the August 15, 2002 injury. The

injuries which he sustained on July 14, 2003, are those which currently disable the plaintiff. The

defendant expects to elicit testimony in this regard at trial and there is ample evidence contained

in the plaintiff's medical records from which the jury can draw the conclusion that a percentage

of the plaintiff's injuries and current disability is due to his preexisting and post-accident

conditions. Given these circumstances, the NECR is clearly entitled to present evidence on

apportionment, both as to the incidents which occurred before and after August 14, 2002; to have

4

the jury instructed on this issue; and to have any award in favor of the plaintiff be reduced by the percentage of damages which are due solely to pre-existing and post-existing conditions.

### III.    CONCLUSION:

WHEREFORE, for all of the above-stated reasons, the defendant respectfully requests that this Honorable Court permit the defendants to introduce any and all evidence of the plaintiff's pre-accident and post-accident medical conditions and instruct the jury on (1) the apportionment of damages between the pre-existing and post-existing medical conditions, (2) the extent to which the accident in question aggravated and/or exacerbated the pre-existing condition, and (3) the extent that the post-accident condition affects the plaintiff's present condition.

Respectfully submitted,

The defendant,

NEW ENGLAND CENTRAL
RAILROAD, INC.,
By its attorneys,


/s/ Michael B. Flynn
Michael B. Flynn, BBO #559023
Valerie A. Murphy, BBO #661460
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169
(617) 773-5500

Dated: July 21, 2006
G:\F & A\CASE FILES\RAILAMERICA\New England Central\JONES, RICKEY A\pleadings\Motion in Limine - Apportionment.doc

Exhibit "A"

**Rickey A. Jones**
**November 1, 2005**

1

Volume I, Pages 1-319

Exhibits 1-11R

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

RICKEY A. JONES                          \*

          Plaintiff                      \*

vs.                                      \* No. 04-11772-MAP

                                         \*

NEW ENGLAND CENTRAL RAILROAD, INC. \*

          Defendant                      \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF:  RICKEY A. JONES

FLYNN & ASSOCIATES, P.C.

400 Crown Colony Drive, Suite 200

Quincy, Massachusetts

November 1, 2005   9:30 a.m.-3:50 p.m.


-----REPORTED BY: CHRISTINE SILVA-ADERMANN/RPR-----

BEACON HILL REPORTING

44 Bayswater Street

Boston, Massachusetts

617.569.8050    Fax 617.569.8150

Rickey A. Jones
November 1, 2005

(Pages 22 to 25)

| 22 | 24 |
|---|---|
| 1   A. If I remember correctly, it was 13 months.<br>2   Q. How long did you make it into it?<br>3   A. About six weeks. 13 weeks, sorry.<br>4   Q. It was a 13-week course?<br>5   A. Yes, sir.<br>6   Q. You made it about halfway?<br>7   A. Yes, sir.<br>8   Q. Were you ever having any problems doing the<br>9 course work?<br>10 . A. Stress levels.<br>11   Q. What do you mean by that?<br>12   A. I couldn't handle the stress.<br>13   Q. You couldn't handle the stress of the runs<br>14 or the course?<br>15   A. Of the course itself.<br>16   Q. In addition to doing the conditioning runs,<br>17 you were also having stress-related problems?<br>18   A. Yes, sir.<br>19   Q. Did you receive treatment, first of all,<br>20 for the stress-related problems?<br>21   A. Negative.<br>22   Q. Was that one of the stated reasons for your<br>23 being pulled out of MOS school?<br>24   A. Correct. | 1 where the bottom of your thigh bone, the femur,<br>2 comes into your knee where it tracks or slides on<br>3 the patella, the kneecap, slides over, you were<br>4 having a problem with that area; correct?<br>5       MR. MYERS:  You are asking him what he<br>6 understands?<br>7       MR. FLYNN:  I'm asking what he<br>8 understands.<br>9   A. I don't know.<br>10   Q. How was it described to you when the<br>11 doctors told you that you had PFS back in the<br>12 military?<br>13   A. It was going up and down correctly.  It<br>14 would get towards the top and track off.<br>15   Q. In other words, the kneecap would get<br>16 towards the top of where it needed to be when you<br>17 would bend your knee; correct?<br>18   A. Yes.<br>19   Q. At that point it would go out of place;<br>20 correct?<br>21   A. I don't know.<br>22   Q. You said it got off track?<br>23   A. Yes.<br>24   Q. What did you understand by that when your |

| 23 | 25 |
|---|---|
| 1   Q. What were the other reasons why you were<br>2 pulled out of MOS training?<br>3   A. I was having problems doing the three-mile<br>4 run in the allotted time.<br>5   Q. What specifically were your problems?<br>6   A. I had pulled a muscle that attaches to my<br>7 kneecap.<br>8   Q. Was that in your right or left knee?<br>9   A. Right.<br>10   Q. Same knee that you claim to have been<br>11 injured in this case; correct?<br>12   A. Correct.<br>13   Q. You were, I believe in your answers to<br>14 interrogatories, you indicated that you were<br>15 diagnosed with something called PFS?<br>16   A. Correct.<br>17   Q. That's patellar femoral syndrome; correct?<br>18   A. Correct.<br>19   Q. You've heard that term before?<br>20   A. Yes, sir.<br>21   Q. In fact, that's what your doctors told you<br>22 you had in the military; correct?<br>23   A. Yes, sir.<br>24   Q. You understand that what that means is that | 1 doctors explained that to you?<br>2   A. I had a weakened muscle, and it wasn't<br>3 guiding the kneecap correctly.<br>4   Q. What treatments did you receive in the<br>5 military for your patellar femoral syndrome?<br>6   A. Physical therapy.<br>7   Q. Who did that physical therapy?<br>8   A. Honestly I don't know names.  It was the<br>9 Marine Corps. It was Navy actually.<br>10   Q. Where was your MOS training?<br>11   A. NAS Pensacola.<br>12   Q. What does NAS stand for?<br>13   A. Naval air station.<br>14   Q. Was there a hospital or clinic there?<br>15   A. Yes, sir.<br>16   Q. What was it called?<br>17   A. We called it sick call.<br>18   Q. It was just the --<br>19   A. It was the hospital for the students.<br>20   Q. At Pensacola?<br>21   A. Yes, sir.<br>22   Q. Did you see a doctor there?<br>23   A. Yeah.  It's so long ago I don't remember<br>24 names. |

Rickey A. Jones
November 1, 2005

(Pages 26 to 29)

26

1    Q. Did you fall out of any of the runs?
2         MR. MYERS: You mean fall to the ground?
3    Q. No, no. You know what I mean by fall out?
4    A. Yes, sir.
5    Q. In terms of a military term?
6    A. Yeah. I wasn't completing in my allotted
7  time.
8    Q. Okay. So it wasn't you were in the middle
9  of a run and you'd have to stop and ask for a medic;
10 right?
11   A. No.
12   Q. It was just that when you got to the end,
13 you were too slow?
14   A. Yeah.
15   Q. That was because your knee was hurting you?
16   A. Yes, sir.
17   Q. Were you limping at that time?
18   A. Only after runs.
19   Q. Only after the runs?
20   A. Couple of hours later it would be fine.
21   Q. Would your knee swell?
22   A. I really can't recall.
23   Q. But in any event, you had enough pain that
24 --

27

1    A. Irritation.
2    Q. Irritation. So that for a couple of hours
3  after these runs it would still hurt you?
4    A. Irritate me.
5    Q. It would prevent you from doing your normal
6  day-to-day activities at least for that two-hour
7  period?
8    A. Honestly I do not remember.
9    Q. Okay. In any event, did you go, did you
10 seek any emergency room treatment for the knee
11 condition while you were in the military?
12   A. No.
13   Q. At some point did a doctor prescribe the
14 physical therapy for you?
15   A. Yes, sir.
16   Q. Was it a doctor that you saw at the naval
17 station?
18   A. It was a Corey Station which was the base
19 just down the road.
20   Q. What's the name of that?
21   A. Corey Station Hospital.
22   Q. What's Corey stand for?
23   A. That's a top-secret military base.
24   Q. That was in what town?

28

1    A. Pensacola.
2    Q. It was different than where you were
3  getting your MOS training?
4    A. It was, it's the only real hospital that we
5  had there.
6    Q. So the physical therapy was conducted
7  actually where you were getting your MOS training,
8  but the doctor you saw was down the road someplace?
9    A. Correct.
10   Q. How do you spell Corey? Is that an
11 acronym, or is that a place?
12   A. I think it was C-O-R-E-Y, if I'm not
13 mistaken.
14   Q. Is that named after somebody?
15   A. I have no idea.
16   Q. Do you know the doctor that you saw at that
17 Corey facility?
18   A. No, sir. It was years ago.
19   Q. But you did see a doctor, you just don't
20 remember his name?
21   A. Yes, sir.
22   Q. How often did you see that doctor?
23   A. Once or twice a month.
24   Q. For how long a period of time?

29

1    A. Five months.
2    Q. How long did you take to undergo the
3  physical therapy?
4    A. I was there for probably four or five
5  months.
6    Q. During this time, was your training
7  suspended?
8    A. Yes, sir.
9    Q. Were you pulled out of the MOS training by
10 that point in time?
11   A. Yes, sir.
12   Q. All you were doing for that five-month
13 period was seeing the doctor and going to physical
14 therapy?
15   A. I had barracks detail, stuff like that.
16   Q. Okay. But your training essentially was
17 ended at that point in time?
18   A. Correct.
19   Q. During that period of time, was a decision
20 being made as to whether or not you would stay in
21 the Marine Corps?
22   A. I had actually started another school.
23   Q. Another MOS school?
24   A. Yes.

8

Rickey A. Jones
November 1, 2005

(Pages 30 to 33)

|  | 30 |
|---|---|
| 1 | Q. That was in Pensacola? |
| 2 | A. Yes. |
| 3 | Q. What was that for? |
| 4 | A. Aviation support. |
| 5 | Q. What does that mean? |
| 6 | A. Aviation mechanics, stuff like that. |
| 7 | Q. How long was that course supposed to last? |
| 8 | A. I don't really know that one. |
| 9 | Q. Did you complete that one? |
| 10 | A. No, sir. |
| 11 | Q. Why is it that you didn't complete that |
| 12 | one? |
| 13 | A. The wheels were already set in motion. I |
| 14 | decided to get out. |
| 15 | Q. Was that your choice to get out? |
| 16 | A. Yes, sir. |
| 17 | Q. Did the Marine Corps want you to stay? |
| 18 | A. Yes, sir. |
| 19 | Q. Did you have to go through some procedure |
| 20 | in order to get out? |
| 21 | A. Yes, sir. |
| 22 | Q. What was that procedure? |
| 23 | A. It was just paper filing, stuff like that. |
| 24 | Q. Was there any hearing or anything like |

|  | 31 |
|---|---|
| 1 | that? |
| 2 | A. Not that I recall. |
| 3 | Q. Who was the person in the Marine Corps who |
| 4 | you had the most direct contact with with respect to |
| 5 | your attempts to get out of the Marine Corps? |
| 6 | A. I really don't know that. |
| 7 | Q. You don't remember it was a major or |
| 8 | corporal or something like that? |
| 9 | A. I don't know. It was I got the papers from |
| 10 | medical and filled them out. |
| 11 | Q. Do you still have those records, by the |
| 12 | way? |
| 13 | A. No, sir. |
| 14 | Q. You filled out some paperwork. Do you |
| 15 | recall what the name of the forms were? |
| 16 | A. No. |
| 17 | Q. You were given some option by which to the |
| 18 | leave the Marines? |
| 19 | A. Yes, sir. |
| 20 | Q. What was the name of that option, or how |
| 21 | was that described? |
| 22 | A. I don't understand the question. |
| 23 | Q. What was the reason you gave for trying to |
| 24 | get out of the military? |

|  | 32 |
|---|---|
| 1 | A. I don't know what the reason was on the |
| 2 | paperwork. That was eight, nine years ago. |
| 3 | Q. What I'm trying to get at, sir, obviously |
| 4 | the Marine Corps wanted you to stay in and you |
| 5 | wanted to get out. There must have been some reason |
| 6 | that you had to give in order to get out of the |
| 7 | Marine Corps before your obligation ended; right? |
| 8 | A. Yes, sir. |
| 9 | Q. What was the reason you were giving? |
| 10 | A. It was a medical discharge. |
| 11 | Q. More specifically, what was the reason for |
| 12 | the medical discharge? |
| 13 | A. Patellar femoral syndrome. |
| 14 | Q. In the right knee; correct? |
| 15 | A. Yes, sir. |
| 16 | Q. You had to put that down on your forms? |
| 17 | A. Yes, sir. |
| 18 | Q. You had to have doctors sign those forms |
| 19 | verifying you had that condition? |
| 20 | A. Yes, sir. |
| 21 | Q. That it prevented you from doing the |
| 22 | physical activities you needed to do as a member of |
| 23 | the Marine Corps; correct? |
| 24 | A. Yes, sir. |

|  | 33 |
|---|---|
| 1 | Q. That was the basis for your |
| 2 | disqualification? |
| 3 | A. Yes, sir. |
| 4 | MR. MYERS: Discharge. He wasn't |
| 5 | disqualified. He was discharged. |
| 6 | Q. Am I using the wrong term? Is discharge |
| 7 | the correct term? |
| 8 | A. Yes, sir. Honorably discharged. |
| 9 | Q. Did you receive any other injuries while |
| 10 | you were in the Marine Corps? |
| 11 | A. No, sir. |
| 12 | Q. Did any doctor diagnose what the cause of |
| 13 | your patellar femoral syndrome was? |
| 14 | A. It was a weakened muscle. |
| 15 | Q. Did you reach an end result in your medical |
| 16 | treatment while you were in the Marine Corps? |
| 17 | A. Yes, sir. |
| 18 | Q. What was that end result? |
| 19 | A. I had the use of the knee back. It was the |
| 20 | track in it. |
| 21 | Q. So physical therapy ended? |
| 22 | A. Yes, sir. |
| 23 | Q. Was that before you were discharged? |
| 24 | A. Yes, sir. |

Rickey A. Jones
November 1, 2005

---

**102**

1  Q. Had you ever injured your right knee prior
2  to August 15, 2002 other than patellar femoral
3  syndrome that you suffered from in the military?
4    A. No, sir.
5    Q. Do you recall injuring yourself playing
6  volleyball June 9 of 2002?
7    A. Yeah.
8    Q. That was to your right knee?
9    A. Yeah. That was sprained.
10   Q. I refreshed your recollection?
11   A. Yes, sir.
12   Q. That was about two months before this
13  incident in August of 2002; right?
14   A. Two, two and a half.
15   Q. Where did that occur?
16   A. At my girlfriend's parent's house.
17   Q. What was your girlfriend's name?
18   A. Debbie Moran.
19   Q. By the way, other than your child with
20  Jessica, do you have any other children?
21   A. No, sir.
22   Q. Just one child that you have?
23   A. Yes, sir.
24   Q. In addition to Sherry's children and

---

**103**

1  Jessica, have you ever had custody of any other
2  children?
3    A. No, sir.
4    Q. You ever paid custody support for any other
5  children?
6    A. No, sir.
7    Q. What are Debbie's parent's names?
8    A. Cathy and Arnold.
9    Q. What was their address?
10   A. I don't know. I mean --
11   Q. What town did they live in?
12   A. St. Albans.
13   Q. Do you remember the name of the road?
14   A. I think Mill River.
15   Q. Mill River Road?
16   A. Yes, sir.
17   Q. Did Debbie live there with her parents?
18   A. Yes.
19   Q. Do you know where she lives now?
20   A. Yeah.
21   Q. Where does she live?
22   A. With her parents.
23   Q. Still keep in touch with her?
24   A. Yes, sir.

---

**104**

1  Q. She still your girlfriend?
2    A. No, sir.
3    Q. Do you currently have a girlfriend?
4    A. No, sir.
5    Q. Are you living with anyone other than your
6  mother?
7    A. No, sir.
8    Q. Why was it that you were playing volleyball
9  on June 9, 2002?
10   A. It was a barbecue. I think it was Debbie's
11  brother's bridal shower or something.
12   Q. Do you recall the names of the other people
13  you were playing volleyball with?
14   A. No, sir, I don't.
15   Q. Do you recall the names of any of them?
16   A. I know Debbie was there and Debbie's
17  brother was there.
18   Q. What was her brother's name?
19   A. Scott.
20   Q. Do you know where he lives?
21   A. Somewhere in South Carolina.
22   Q. Scott Moran is his name?
23   A. Yes, sir.
24   Q. Still in touch with him?

---

**105**

1    A. No, sir.
2    Q. Do you remember the name of anybody else
3  who was playing volleyball that day?
4    A. No, sir.
5    Q. Do you remember the name of anybody else
6  who was at the shower?
7    A. No, sir. I didn't know too many people
8  there.
9    Q. Was there a video made of the volleyball
10  game?
11   A. Not that I'm aware of.
12   Q. Was there a video made of the shower?
13   A. I don't know.
14   Q. Tell me what happened?
15   A. Playing volleyball. Jumped up and hit a
16  ball and twisted my knee.
17   Q. Your right knee?
18   A. Yes.
19   Q. You jumped up and when you came down, you
20  twisted it?
21   A. Yeah. I think I was falling backwards.
22   Q. Did you step on anybody else or anything
23  like that?
24   A. I don't remember.

---

Rickey A. Jones
November 1, 2005

(Pages 106 to 109)

| | 106 |
|---|---|
| 1 | Q. Just right on the ground? |
| 2 | A. Yes, sir. |
| 3 | Q. There wasn't a hole there or anything? |
| 4 | A. I don't think so. |
| 5 | Q. You haven't made a claim against Ms. Moran |
| 6 | or her parents as a result of that injury, have you? |
| 7 | A. No. |
| 8 | Q. Or against anybody else? |
| 9 | A. No, sir. |
| 10 | Q. Were you able to get back up? |
| 11 | A. Yes, sir. |
| 12 | Q. Walk around? |
| 13 | A. I tried. |
| 14 | Q. Were you on the ground at all for any |
| 15 | period of time before you got back up? |
| 16 | A. Few seconds. |
| 17 | Q. Did you need help getting back up? |
| 18 | A. I don't remember. |
| 19 | Q. Did your knee swell up? |
| 20 | A. I don't remember. |
| 21 | Q. What happened after you got back to your |
| 22 | feet? |
| 23 | A. Went in the house and relaxed. |
| 24 | Q. You went to the hospital? |

| | 108 |
|---|---|
| 1 | A. Really I don't -- this is four years ago, |
| 2 | five years ago. |
| 3 | Q. Regardless of how long ago it was, do you |
| 4 | have any recollection as to the actual mechanics of |
| 5 | what happened to your knee when you jumped up in |
| 6 | this volleyball game and came back down on your |
| 7 | right leg? |
| 8 | A. No, sir. |
| 9 | Q. Do you recall feeling pain in your knee at |
| 10 | that time? |
| 11 | A. A little bit. It was a tender. |
| 12 | Q. Where was the pain? To the best of your |
| 13 | memory where was the pain? |
| 14 | A. I don't even know. |
| 15 | Q. Did it involve the kneecap? |
| 16 | A. No, sir. |
| 17 | Q. Did it involve -- |
| 18 | A. It was a muscle I think on the inside of |
| 19 | the leg. |
| 20 | Q. On the inside of the leg? |
| 21 | A. Yeah. |
| 22 | Q. Was it on the thigh side of the knee, or |
| 23 | was it -- in other words, above the knee, or was it |
| 24 | on the tibia or shin part? |

| | 107 |
|---|---|
| 1 | A. Yes. |
| 2 | Q. That was the next day? |
| 3 | A. Next day. |
| 4 | Q. That was Northwest Medical Center? |
| 5 | A. Yes, sir. |
| 6 | Q. Went to the emergency room there? |
| 7 | A. Yes, sir. |
| 8 | Q. You actually missed about two weeks from |
| 9 | work; right? |
| 10 | A. Yeah. On advice of the company doctor. |
| 11 | Q. Who was Dr. Backus? |
| 12 | A. I didn't remember his name. |
| 13 | Q. Does that name sound familiar, Vernon |
| 14 | Backus? |
| 15 | A. Vaguely. |
| 16 | Q. How high up did you jump when you came down |
| 17 | on your knee during that volleyball game? |
| 18 | A. I didn't come down on the knee. |
| 19 | Q. You came down on the right leg? |
| 20 | A. I don't know. |
| 21 | Q. What happened to the knee? Did it buckle |
| 22 | inward, did it twist? |
| 23 | A. It just twisted. |
| 24 | Q. Did it twist inward or outward? |

| | 109 |
|---|---|
| 1 | A. That I really don't know. I remember it |
| 2 | was inside. |
| 3 | Q. The best you can say is inside? |
| 4 | A. Yeah. |
| 5 | Q. Do you know that's called the anterior |
| 6 | portion of the knee? |
| 7 | A. Yeah. |
| 8 | Q. You do know that? |
| 9 | A. Yeah. |
| 10 | Q. Do you recall you also were suffering from |
| 11 | pain in the medial portion of the knee? |
| 12 | A. Not that I'm aware of. |
| 13 | Q. What was the diagnosis that was given at |
| 14 | the emergency room? |
| 15 | A. A sprain. |
| 16 | Q. A sprain of the right knee? |
| 17 | A. Yes. |
| 18 | Q. Do you remember the doctors also suggested |
| 19 | that there might be other possible problems with |
| 20 | your knee at that time? |
| 21 | A. I don't remember that. |
| 22 | Q. Do you remember the doctors told you it was |
| 23 | possible that you had a meniscus tear? |
| 24 | A. No. |

28

Rickey A. Jones
November 1, 2005

(Pages 110 to 113)

**110**

1    Q. You don't remember any doctors telling you
2  that?
3    A. No, sir.
4    Q. Do you remember Dr. Backus telling you that
5  during your return-to-work physical?
6    A. No, sir.
7    Q. Do you remember on June 14, 2002 you did go
8  to a return-to-work physical with a doctor named
9  Backus?
10    A. Yes, sir.
11    Q. Do you remember where that occurred, where
12 that was?
13    A. His office.
14    Q. Where was that located?
15    A. I think it was in Northwestern Medical
16 Commons.
17    Q. Do you recall that he thought you might
18 have a tear of your meniscus at that time?
19    A. No, sir. He never said nothing about it to
20 me.
21    Q. You know what the meniscus is now; correct?
22    A. Yes, sir.
23    Q. Did you know one of allegations you're
24 making in this case is that as a result of the

**111**

1  August 15, 2002 incident you suffered a tear of your
2  meniscus; right?
3    A. Yes, sir.
4    Q. But nobody told you that you had such a
5  condition or might even have had such a condition as
6  a result of the volleyball incident; is that fair to
7  say?
8    A. No, sir.
9    Q. You agree with me, nobody told you that?
10    A. Yes, sir.
11    Q. When you went to see Northwestern Medical
12 Center following your volleyball injury, did you
13 tell them about patellar femoral syndrome that you
14 had suffered from in the military?
15    A. I don't recall.
16    Q. Did you give them the history, any history
17 of having any prior problems with your right knee?
18    A. I don't recall.
19    Q. Did you know at that time what an anterior
20 cruciate ligament was?
21    A. No.
22    Q. Did you know what an ACL was?
23    A. No.
24    Q. I'm going to show you a record which is a

**112**

1  printout of the emergency room record at
2  Northwestern Medical Center. I'll have this marked
3  as Exhibit 1.
4      (Marked, Exhibit 1, Emergency Room
5  Record from Northwestern Medical Center)
6      MR. FLYNN: I'll represent to you that
7  the highlighting is mine. Want to take a look at
8  it, Bob.
9    Q. Have you ever seen that document before,
10 sir?
11    A. Don't recall.
12    Q. Okay. Let me show you something here. Do
13 you remember that by the time you went to the
14 emergency room on June 10, 2002 that you were unable
15 to straighten your knee?
16    A. I don't remember that. I know I couldn't
17 bend it all the way back.
18    Q. Do you remember that you felt that when you
19 tried to straighten it that you felt something go
20 back into place?
21    A. No.
22    Q. Do you remember that you had swelling and
23 pain at that time?
24    A. I remember having pain.

**113**

1    Q. Do you remember having swelling?
2    A. I could have.
3    Q. Let me show you this sentence here on the
4  first page, was unable to straighten the knee and
5  then something went back into place and now has
6  swelling and pain; did I read that correctly?
7    A. Yes.
8    Q. Does that refresh your memory that you were
9  suffering from those symptoms when you went to see
10 the doctor on June 10, 2002?
11    A. No.
12    Q. Do you remember hearing a pop when you came
13 down on your right leg during that volleyball game?
14    A. I don't remember it, no.
15    Q. Let me just refer you to the same record,
16 Exhibit 1. Landed on his knee and heard a pop; did
17 I read that correctly?
18    A. Yes.
19    Q. Does that refresh your memory that that did
20 occur to you during the volleyball game?
21    A. I didn't land on my knee, I know that.
22    Q. Does it refresh your memory that you heard
23 a pop at that point in time?
24    A. No, sir.

Rickey A. Jones
November 1, 2005

(Pages 206 to 209)

|     | 206 |
| --- | --- |
| 1 | supposed to have been done. I don't have any record |
| 2 | of him actually getting on the table. Do you have |
| 3 | anything on that? |
| 4 | A. I didn't go to the surgery room. This was |
| 5 | presurgery. They put me in the gown and gave me the |
| 6 | medication to sedate me and come in and check me |
| 7 | before they took me off to the surgery room. |
| 8 | Q. You say Dr. Beattie came in? |
| 9 | A. He come in. Long asked for his assistance |
| 10 | to assist. |
| 11 | Q. You remember this happening? |
| 12 | A. No. |
| 13 | Q. They told you this afterwards? |
| 14 | A. Yes, sir. I was sedated. |
| 15 | Q. What do you recall, what's your impression |
| 16 | of what happened during that? |
| 17 | A. I have none. They gave me something. I |
| 18 | was gone. |
| 19 | Q. But they told you later? |
| 20 | A. They told me they checked it. And when |
| 21 | they checked it, I had -- I don't know even what the |
| 22 | technical term is -- they couldn't feel the ACL. |
| 23 | Q. They couldn't feel it at all? |
| 24 | A. No. |

|     | 207 |
| --- | --- |
| 1 | Q. It wasn't there? |
| 2 | A. The best I can recollect that's what they |
| 3 | said. |
| 4 | Q. Dr. Beattie in the practice with Dr. Long |
| 5 | he has more experience with ACL tears? |
| 6 | A. He's the lead doctor, I guess. |
| 7 | Q. So was it decided at that point that he |
| 8 | would take over your care? |
| 9 | A. Yes, sir. |
| 10 | Q. Then he did a surgery for you in December |
| 11 | of 2002? |
| 12 | A. December 10, I think. |
| 13 | Q. Yes. Right? |
| 14 | A. Yes, sir. |
| 15 | Q. That surgery was partially diagnostic and |
| 16 | partially reconstructive; right? |
| 17 | A. No, sir. |
| 18 | Q. Well, they confirmed that you had the ACL |
| 19 | tear as a result of that procedure; right? |
| 20 | A. Yes, sir. |
| 21 | Q. They also confirmed that you had a tear of |
| 22 | your meniscus? |
| 23 | A. Yes, sir. |
| 24 | Q. They reconstructed your ACL? |

|     | 208 |
| --- | --- |
| 1 | A. Yes, sir. |
| 2 | Q. They harvested a graft from your patella |
| 3 | tendon; correct? |
| 4 | A. Yes, sir. They tried to get it from the |
| 5 | hamstring. |
| 6 | Q. They couldn't do that? |
| 7 | A. No. |
| 8 | Q. Then they did a meniscectomy; correct? |
| 9 | A. Yes, sir. |
| 10 | Q. That basically took out the torn portion |
| 11 | and reconstructed it? |
| 12 | A. Yes, sir. |
| 13 | Q. They also found that you had chondromalacia |
| 14 | of your medial femoral condyle; correct? |
| 15 | A. I have no idea. |
| 16 | Q. Do you remember them telling you that they |
| 17 | found evidence of chondromalacia or arthritis, a |
| 18 | wearing out of the bone in the joint where your |
| 19 | thigh bone, your femur comes in contact with your |
| 20 | patella? |
| 21 | A. Roughly. |
| 22 | Q. Okay. That was about the same area where |
| 23 | you had suffered from patellar femoral syndrome when |
| 24 | you were in the service; correct? |

|     | 209 |
| --- | --- |
| 1 | A. Yes, sir. |
| 2 | Q. And when you were treated at the emergency |
| 3 | room at Northwest Medical Center, you never told the |
| 4 | doctors or the nurses there that you had had prior |
| 5 | knee problems, the patellar femoral syndrome, while |
| 6 | in the service, did you? |
| 7 | A. Not that I remember. |
| 8 | Q. You didn't tell them about the incident |
| 9 | that occurred two months earlier with the volleyball |
| 10 | playing; correct? |
| 11 | A. I don't know about that. |
| 12 | Q. As we sit here today, you don't remember |
| 13 | that, do you? |
| 14 | A. No. |
| 15 | Q. You agree with what I said, you don't |
| 16 | remember? |
| 17 | A. I think I would have told him. |
| 18 | Q. Do you have a memory of telling them? |
| 19 | A. No. |
| 20 | Q. You didn't tell Dr. Long about your |
| 21 | patellar femoral syndrome that you had in the |
| 22 | service, did you? |
| 23 | A. I don't remember that. I know I told |
| 24 | Beattie. |

Rickey A. Jones
November 1, 2005

**214**

1 as Exhibit 9. This is a portion of the discharge
2 note from your discharge summary from Rehabilitation
3 Services At Northwest Medical Center.
4      MR. MYERS: Which one is it? What's the
5 date?
6      MR. FLYNN: Signed on June 9, 2003. But
7 it's talking about a discharge which occurred -- or
8 event which occurred March 14, 2003.
9      (Marked, Exhibit 9, Portion of Discharge
10 Note)
11      MR. MYERS: Can you read it?
12 A.  Yeah. It kills my head though.
13      MR. MYERS: Would these help you.
14 A.  No. I'll go blind.
15 Q.  Have you had a chance to look at Exhibit 9?
16 A.  Yes, sir.
17 Q.  Therapist note there was that on March 14,
18 2003 you demonstrated no difficulty jumping from a
19 static position and you were able to step up and off
20 a 20-inch step and that you had judged that this was
21 the average height you had to negotiate at work.
22 Did I read that correctly?
23 A.  Yes, sir.
24 Q.  Do you recall that that actually occurred

**215**

1 at the end of your physical therapy sessions
2 following the first surgery?
3 A.  Yes.
4 Q.  Then you actually stated that you were
5 planning on returning to work; correct?
6 A.  Yes, sir.
7 Q.  Not that Dr. Beattie released you to work
8 but you planned on returning to work?
9 A.  He released me.
10 Q.  You felt you were able to do so; correct?
11 A.  I felt he felt I was able to do so.
12 Q.  You did go back to work?
13 A.  Either that or be fired.
14 Q.  You continued to work for four months
15 afterwards?
16 A.  I don't really know.
17 Q.  You went back on March 24, 2003; right?
18 A.  Yes.
19 Q.  Then you were injured again in July of
20 2003; correct?
21 A.  Yeah.
22 Q.  Are you saying you only went back to work
23 because you had to?
24 A.  Yes, sir.

**216**

1 Q.  You wouldn't have gone back to work if you
2 had your choice?
3 A.  No, sir.
4 Q.  You're saying you were forced back to work
5 by the railroad?
6 A.  I'm saying I felt like I was forced back.
7 Q.  How were you felt like you were forced
8 back?
9 A.  Either work or get fired. I mean, I don't
10 have any other skills.
11 Q.  Did anyone at the railroad communicate that
12 to you?
13 A.  Charlie Moore had actually come up and told
14 me I was a liar.
15 Q.  What did he say you were lying about?
16 A.  He told me I didn't get hurt on the job, I
17 got hurt off the job. And I don't want to use the
18 exact terminology here.
19 Q.  I think you do. What did he --
20 A.  He called me a fucking liar.
21 Q.  When did that occur?
22 A.  Right after I got hurt.
23 Q.  After the August 15, 2002 incident?
24 A.  Yeah. Probably around October/November of

**217**

1 the same year.
2 Q.  You hadn't returned to work at that point
3 in time?
4 A.  I went up to see him because he was the
5 vice president.
6 Q.  What did you go up to see him about?
7 A.  He was going to -- he was asking me how I
8 was doing.
9 Q.  Why did you go see him? That's the first
10 question.
11 A.  I wanted to maintain some sort of relations
12 with the company. I didn't hate the company. I
13 really enjoyed working there. And from that point
14 on I knew where I stood.
15 Q.  Wait a minute. First question is why did
16 you go see him? Just to keep in contact with the
17 company?
18 A.  Yeah. I'd go up to the office building and
19 talk to some of the guys in charge. And run into
20 Charlie Moore.
21 Q.  Just one time you ran into him, or were
22 there other times?
23 A.  No. I dodged him after that.
24 Q.  This was the one time he called you a liar?

Rickey A. Jones
November 1, 2005

(Pages 222 to 225)

---

**222**

1     A. At a wedding I think it was. I think it
2 was at her wedding.
3     Q. Her wedding? You were there?
4     A. Yes, sir.
5     Q. Was there a video made of that wedding?
6     A. I don't know.
7     Q. This was after your accident?
8     A. The wedding -- I think it was just after
9 the accident or just before.
10     Q. After which one, the August 15 or July '03?
11     A. There was no accident on July '03.
12     Q. Okay. It was after the August 15 incident?
13     A. Yes, sir.
14     Q. Was it before the July '03 incident?
15     A. It had to be before that.
16     Q. Have you attended any other weddings since
17 August 15, 2002?
18     A. Couldn't get around.
19     Q. My question is did you attend any weddings
20 other than that one?
21     A. Yeah, I did.
22     Q. Whose other weddings did you attend?
23     A. My best friend got married.
24     Q. Were you in the wedding party?

---

**223**

1     A. Yeah.
2     Q. Were you the best man?
3     A. Yes, sir.
4     Q. What was his name?
5     A. Ryan Cotton.
6     Q. Ryan Cotton?
7     A. Yes, sir.
8     Q. Where does he live?
9     A. Georgia.
10     Q. Whereabouts?
11     A. Warrenton.
12     Q. Do you know the address?
13     A. I don't know the address. I call him. I
14 know how to drive to his house.
15     Q. Is there a video of that wedding?
16     A. I don't know.
17     Q. Do you have a copy of it?
18     A. Me, no.
19     Q. When was that wedding, when did that occur?
20     A. Late November. I think it was November 30.
21     Q. Of '04?
22     A. No, sir. Of '03.
23     Q. So let me see if I got this straight.
24 Based on your understanding of what happened to Mr.

---

**224**

1 Smith, based on what he and his daughter told you,
2 you drew the conclusion from that that if you didn't
3 go back to work once your doctor cleared you to go
4 back to work, you would have been fired?
5     A. Yes, sir.
6     Q. You felt that you weren't able to go back
7 to work, but because of that fear you decided to do
8 that anyway?
9     A. Correct.
10     Q. No one from the railroad told you that once
11 you were cleared medically to go back to the work
12 you would be fired if you did not; correct?
13     A. I don't really know what you are saying.
14     Q. I'm not saying anything. I'm asking you
15 did anyone from the railroad point-blank tell you
16 that?
17     A. Point-blank, no.
18     Q. Was there some kind of a toose
19 (phonetic) reference made from somebody from the
20 railroad?
21     MR. MYERS: What reference?
22     Q. Was there a vague reference made?
23     A. You can ask anyone who works there Charlie
24 Moore will tell you it's his way or the highway.

---

**225**

1 That's the way he runs his shop.
2     Q. And he told you if you didn't come back to
3 work once the doctor said you'd be able to, you
4 would be fired?
5     A. He didn't have to. The conversation we had
6 prior to was enough.
7     Q. Once you went back to work in March of '03,
8 you did not miss any time until the July 14, 2003
9 incident; is that fair to say?
10     A. Correct.
11     Q. You worked your full shifts; correct?
12     A. Correct.
13     Q. You worked some overtime; correct?
14     A. Probably.
15     Q. At the time of your first incident August
16 2002, were you regularly participating in
17 recreational activities?
18     A. Regularly, no.
19     Q. Do you have an ATV?
20     A. No.
21     Q. Did you have a motorcycle?
22     A. No.
23     Q. Did you do any four-wheeling offroad stuff?
24     A. No, sir.

---

Rickey A. Jones
November 1, 2005

(Pages 234 to 237)

234

1    A.  Probably.  Because the drains just hard to
2  come by, I mean, the smell is atrocious.
3    Q.  Now, you had an incident on July 14, 2003?
4    A.  What is that?
5    Q.  Well, something occurred on July 14 of
6  2003.  Did you reinjure yourself?
7    A.  It had been hurting.  It wasn't a
8  reoccurrence.  It was, you know, it buckled like
9  normal, and I just couldn't go on.
10   Q.  That was happening to you on a regular
11  basis?
12   A.  Ever since I went back to work, well, about
13  a month, month and a half after I went to work.
14   Q.  Was that happening to you off the job as
15  well?
16   A.  No.  Because I didn't really move around.
17  My leg was dead.
18   Q.  When you were home, you were sitting
19  around?
20   A.  I was lethargic.
21   Q.  When you were at work, you had to move
22  around because it was part of your job?
23   A.  Yes, sir.
24   Q.  It was the condition of moving around that

235

1  caused you to have pain; correct?
2    A.  Yes, sir.
3    Q.  From time to time your knee would buckle?
4    A.  Yes, sir.
5    Q.  That had nothing to do with the condition
6  of the ground underneath your feet; is that fair to
7  say?
8    A.  Sometimes it did.  If I stepped wrong into
9  the oil and my foot slid out from under me, it's
10  going to buckle regardless.
11   Q.  Is that what happened on July 14, 2003 or
12  was it simply walking and your knee buckled on you?
13   A.  I think actually I was coming off a car and
14  when my foot hit the ground put weight on it, it
15  buckled.  I know it was 104.  I can't remember if I
16  was coming off a car or walking down 104.
17   Q.  Do you recall giving Mr. Ogden a statement
18  with respect to that incident?
19   A.  Yes, sir.
20   Q.  That was only a few days after the incident
21  occurred?
22   A.  I do remember that.
23   Q.  Were you on pain medications at that point
24  in time?

236

1    A.  No.  They made loopy prior to.  I didn't
2  want to take them anymore.
3    Q.  When did you stop taking pain medication?
4    A.  Well, before I went back to work.
5    Q.  You weren't taking them as of the date of
6  that incident, were you?
7    A.  No.
8    Q.  You weren't taking them at the time you
9  gave a statement to Mr. Ogden?
10   A.  Which time?
11   Q.  The second statement?
12   A.  No, sir, I wasn't.
13       MR. MYERS:  I need to take a break.
14       (Break taken)
15   Q.  July 14, 2003, sir, you remember in that
16  statement to Mr. Ogden that you gave following that
17  incident that you told him there was nothing unusual
18  about the yard and the area where you had this
19  incident and that your knee simply pinched and
20  buckled underneath you; do you remember telling him
21  that?
22   A.  Yeah.  It was nothing unusual.  It was the
23  same.
24   Q.  So there wasn't any defective condition

237

1  there, was there?
2    A.  Not that I can remember.
3    Q.  Okay.  In fact, you didn't report any
4  defective condition, did you?
5    A.  No.
6    Q.  In fact, you didn't make any report of this
7  condition at all, did you?
8    A.  Actually I talked to Steve Larro in the
9  yard or around the yard talking on the radio.
10   Q.  You didn't make any written report of the
11  incident, did you?
12   A.  I was not asked to.
13   Q.  You remember telling Mr. Ogden in your
14  statement the reason you didn't make out a written
15  report was because there was, quote, "nothing to
16  report," end of quote?
17   A.  There wasn't.
18   Q.  Right.  There wasn't, you agree with that?
19   A.  Yeah, I agree.
20   Q.  There wasn't any hole or piece of scrap
21  iron or something that you stepped on that wasn't
22  supposed to be there?
23   A.  No.  It was reoccurring from the August 15.
24   Q.  Okay.

60

# EXHIBIT B

Harvey Montijo, M.D.
Garvin Yee, M.D.
Mark Waeltz, M.D.
Veronica Pedro, M.D.
Michael Mikolajczak, D.O.
Jose Ortega, M.D.



the center for
## BONE
&JOINT
SURGERY
OF THE PALM BEACHES

Jorge Acevedo, M.D.
Enrique A. Palmer, M.D.
Ahamed Mohaideen, M.D.
Charles Williamson, M.D.

February 22, 2005

**FINAL NARRATIVE ON:**

**HISTORY OF PRESENT ILLNESS**

RICKY JONES

As you are aware Mr. Jones was involved in a work related accident on 8/15/02. He has been an established patient of mine since 1/6/04.

As of November 12, 2004, the patient reached a point of maximum medical improvement with what I feel as causally related injuries to his right knee which consists of post-traumatic ACL reconstruction with partial meniscectomy, osteochondral defects with patellofemoral joint and medial femoral condyle, i.e., post-traumatic osteoarthritis and also with synovitis and continued ACL laxity with instability.

Permanent recommendations for this patient would consist of light duty status with no lifting, bending, stooping, squatting or kneeling. He is a heavy laborer and certainly it is not amenable for him to return back to his previous level of work with New England Central Railroad. He is however able to be re-trained vocationally if possible. Otherwise his permanent restrictions would confine him from a heavy laborer position.

I feel that he can continue with a home exercise program, bracing, and medication as needed. I did offer him regular visits. I don't feel at this point that surgery is in the early future for him. However as a 30-year-old male, the possibility for further surgical intervention with progressive instability may require further surgical intervention to consist with ACL reconstruction, revision reconstruction, injection therapy with cortisone and the possibility of Viscoelastic injections which are used to treat mild to moderate osteoarthritis. I feel that long term for this patient a total joint replacement may certainly be considered.

According to the AMA Guidelines, the patient has sustained a permanent impairment of 10%.

All of the above opinions are based on a reasonable degree of medical probability. Should you have any further questions or concerns, please feel free to contact me.

Sincerely,

Michael Mikolajczak, D.O.
MM/lj

# EXHIBIT C

Fairfield Street
802-524-5911

EMERGENCY DEPARTMENT RECORD

P  ient:            JONES, RICKEY
M. ..ical Record:   128162
Acct #:             7417397
Age:                27.00
Sex:                M
DOB:                11/17/1974
Visit Date          6/10/2002
PMD:                NONE




EXHIBIT

BP: 142/90 mm. Hg Sitting 12:40
P: 77 /min.  12:41
Resp: 20 /min.  12:41
Temp: 97.2 F Tympanic 12:41

CC: 1) Soft tissue injury to right knee.
FINAL DIAGNOSIS 1) Soft tissue injury right knee

ALLERGIES: [betadine] (JLM)
MEDICATIONS: Not taking any prescription medication. (JLM)
ACUITY:

12:36 Triage acuity - level 3 (Non-Urgent).  Pain scale rated = 2/5.  Triaged to
the Emergency Department (JLM)
TRIAGE & NURSING HISTORY: Presents with acute injury. The patient  fell after
loosing their footing in sports. Jumped while playing volleyball and landed on
hi  knee and hearda pop and had sudden pain. Was unable to straighten the knee
ar.  then something went back in to place and now has swelling and pain.

12:36 Symptoms started approximately [1] days ago. Patient is source of history.
The patient is appropriate and reliable. Injury can be coded as occurring at an
outdoor recreational area. (JLM)
PRE ARRIVAL TREATMENT: Patient arrived at facility by own transportation.
LANGUAGE: Fully verbal - speaks English.
DEMEANOR: Alert and oriented.  (JLM)

RN CONTINUATION NOTES:
14:34 Pain scale at discharge 1/5 (AWB)

NURSING DISPOSITION:

14:33 Condition: Improved. Patient verbalized understanding and importance of
aftercare instructions and medication instructions. Patient verbalized
understanding of need for follow-up and how to obtain follow-up. Patient
instructed to return to ED if worse or new symptoms.

14:34 Patient discharged from department. Patient was discharged from department
to home. Left ambulatory. Accompanied by a friend. No outstanding psychosocial
needs (AWB)

CLINICIAN  NOTE

CONCISE SUMMARY: [pt with hx of acl and lateral ligament injury to right knee in
'9'  no surgical repair)..jumped up while playing volleyball and landed with
acute onset of knee pain ..exacerbated by weight bearing and mitigasted with
rest..no prehosp tx] (AB)

.Mechanism of knee injury was [unclear]. Local soft tissue swelling over right knee.

General History and Problem specific ROS: No history of head injury or loss of
c  ciousness (LOC). Athletic injury. Injury occurred while [volleyball]. Is
a  : to bear weight on the right knee.
PMH/ROS: History of [right knee ACL and lateral ligament injury ( no repair
done)]. Except as noted the remainder of the Review of Systems is negative. (AB)
SH: Lives by self. Lives in a home environment. Single.

PHYSICAL EXAM:

GENERAL PRESENTATION: This is a well developed well nourished alert adult male.
He does not appear to be acute distress.  No evidence of significant external
trauma.  Vital signs OK.

NEUROLOGIC EXAM: Symmetric reflexes normal strength and tone. Good co-ordination

DERMATOLOGIC EXAM: No evidence of abrasion or laceration noted over right
anterior knee.

MUSCULOSKELETAL EXAM: MODERATE INJURY TO:>>>right anterior knee [and medial
knee]<<< moderate joint pain with movement/ not tender to palpation/ moderate
amount of swelling-effusion/ no sign of contusion/ no evidence of hematoma/
ligaments are intact/ no obvious deformity/ The rest of the knee exam is
unremarkable.  The distal neurovascular exam is OK, and grossly intact sensory
exam. Neither the ankle nor the foot are significantly tender or swollen and the
proximal femur thigh is also OK. The rest of the soft tissue exam is normal.

IN .  PRETATION OF TESTS:

14:18 X-ray of right Knee - 3 views - these films were reviewed by me in the
clinical context of this case. No radiographic evidence of acute fracture. (AB)
RX: Ibuprofen 800 mg PO TID quantity (21)
SYMPTOM AND PROBLEM LIST:: Pain involving the right knee Soft tissue swelling
of the right knee Soft tissue injury right knee Fall Recreational injury Drug
allergy History of prior drug allergy

PHYSICIAN DISPOSITION:

14:18 [pt with knee injury most likely medial ligament..no joint instability.
.will use ice, ibuprofen , knee immobilizer and ortho f/u prn] Condition:
Improved.

.4:27 Order placed for patient to be discharged from the department. Arrange for
a follow up appointment with DR. BEATTIE,  ROBERT 802-527-1282, NORTHWESTERN
ORTHOPAEDIC 3 CREST RD, ST ALBANS, VT 05478 in in 1-2 weeks for no improvement
(AB)


ORDERS SUMMARY


| Medication | MD | Ordered | Started | Note |
|---|---|---|---|---|
| X-  of right Knee plus Patellar views | AB | AB 13:40 | AB 14:17 | |
| INDICATION: trauma | | | AB 14:17 | |
| 800 mg of Ibuprofen PO | AB | AB 13:40 | AB 14:17 | |

Knee immobilizer    AB    AB 14:18   AB 14:26

Electronic Signatures derived from a single controlled password

Anne Bowers NP (AB)

J͑ꞏnn L Manahan RN (JLM)

Anne W Bowers NP (Print for RN (AWB)