UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

RICKEY A. JONES,
             Plaintiff,

      v.

NEW ENGLAND CENTRAL RAILROAD,
INC.,
            Defendant.

Civil Action No.: 04-11772-MAP

## NEW ENGLAND CENTRAL RAILROAD, INC.'S MOTION IN LIMINE TO EXCLUDE PLAINTIFF'S "DESIGN DEFECT" THEORY

The New England Central Railroad, Inc. ("NECR") moves in limine to have the plaintiff's "design defect" theory excluded, on the grounds that this theory is preempted by federal law. The NECR also requests that this Honorable Court instruct the jury that a verdict for the plaintiff cannot be based on this theory of liability.

### I. FACTUAL BACKGROUND:

On August 15, 2002, the plaintiff was working for the NECR as a conductor at the NECR's yard in St. Albans, VT. He allegedly fell from a railroad tank car and injured his right knee. At the time of the alleged accident, the plaintiff was attempting to dismount the tank car, which he had been riding during the performance of switching operations in the yard. The plaintiff was dismounting from a stirrup (otherwise known as a "sill" or "sill step"), a piece of equipment attached to the tank car (by its manufacturer) which functions much like a ladder rung for mounting/dismounting purposes.

The plaintiff has brought this lawsuit pursuant to the Federal Employer's Liability Act ("FELA"). He claims that the NECR was negligent in the design of the stirrup/sill, because it

forced him to assume an awkward position, thereby (allegedly) causing his fall.  The plaintiff

also claims that he was caused to "slip" off the stirrup because he "may have" gotten rotten

grain/feed, oil and/or grease on the soles of his boots- according to the plaintiff, these substances

were present "everywhere" in the yard, and he was "forced" to walk through them in the course

of his workday.  Finally, the plaintiff claims that the tank car was "covered" in slurry, a white

powdery substance that becomes slippery when wet.  *See* transcript of the plaintiff's deposition, a

copy of the relevant portions of which are attached as Exhibit "A." at p.148-149, 183.

Shortly after his accident, the plaintiff filled out an *Injury Report*, in which he denied that

the tank car, or any other conditions, were defective or causative factors in his accident.  See

*Plaintiff's Injury Report*, a copy of which is attached as Exhibit "B."  He also specifically failed

to mention the presence of grease, oil, feed and/or slurry.  Id.  On August 21, 2002, the plaintiff

gave a statement to an investigator hired by the NECR, in which he stated that he simply fell -

he failed to identify or complain of any defective condition whatsoever.  Exh. A at p. 186-88.

The day following the plaintiff's alleged accident, the tank car (including its stirrup) was

thoroughly inspected by Thomas Tozzer, an NECR employee - no defects were noted, nor were

any foreign substances found.  *See Car Inspection Report*, a copy of which is attached as Exhibit

"C."

## II.    DISCUSSION OF LAW:

### A.    Overview of the FRSA and History of Preemption:

The Supremacy Clause of the United States Constitution provides that the laws of the

United States "shall be the supreme Law of the Land...any Thing in the constitution of Laws of

any state to the contrary notwithstanding."  Art. VI, cl. 2.  "Where a state statute conflicts with or

frustrates federal law, the former must give way."  CSX Transportation v. Easterwood, 507 U.S.

658, 663 (1993), citing U.S. Const., Art. VI, cl. 2; see also <u>Cipollone v. Liggett Group, Inc.</u>, 505 U.S. 504, 516 (1992); <u>Maryland v. Louisiana</u>, 457 U.S. 7254, 746, (1981). Common law can be preempted in three ways: (1) where it directly conflicts with a federal law (conflict preemption); (2) where it is preempted by an expressed provision in the federal law (expressed preemption); or (3) where Congress intended that the federal law occupy the field of the subject matter covered by the law (field or implied preemption).

Railroad operations and facilities, including railroad equipment and rolling stock, are governed by a comprehensive scheme of federal statutes and their implementing regulations, including the *Federal Railroad Safety Act* ("FRSA"). In 1966, Congress transferred the responsibility for rail safety to the Secretary of Transportation,[1] which in turn delegated those responsibilities to the Federal Railroad Administration ("FRA"), a unit of the Department of Transportation ("DOT"). *See* 49 C.F.R. § 1.49(m).[2] The FRA has promulgated specific and detailed specifications and safety standards for all types of railroad equipment, activities and operations (*see, e.g.,* 49 C.F.R. parts 179, 210, 214, 215, 220, 221, 223, 229, 231-232 and 238).

The FRSA was enacted in 1970 and its stated purpose is "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101.[3] Under the FRSA, the Secretary is given broad power to "prescribe regulations and issue orders

---

[1] The authority to regulate rail safety was originally vested in the ICC. In 1966, rail safety functions were transferred to the Department of Transportation by section 6(e) of the *Department of Transportation Act*, Pub.L.Co. 89-670, 80 Stat. 93 (1966).

[2] Act of October 15, 1966, Pub. L. 89-670 § 6(e)(1), 80 Stat. 939, formerly codified at 49 U.S.C. §1655(e)(1).

[3] The FRSA was previously codified at 45 U.S.C. § 421, *et seq*. On July 5, 1994, Pub. L. No. 103-272, § 7(b), 108 Stat. 1379 (1994), the former version of the FRSA was repealed, amended and moved to 49 U.S.C. §§ 20101 to 21311. Although the 1994 recodification resulted in minor changes in the FRSA's language, the modifications did not substantially change the law. Cases interpreting the pre-1994 version of the FRSA are therefore applicable with equal force and effect to the current version. *See* <u>O'Bannon v. Union Pacific R.R. Co.</u>, 960 F. Supp. 1411, 1416 at n.3 (W.D. Mo. 1997).

for every area of railroad safety." <u>Id</u>.  The FRSA contains an express preemption provision,

which states:

> Laws, regulations, and orders related to railroad safety shall be
> nationally uniform to the extent practicable.  A State may adopt or
> continue to enforce a law, regulation, or order related to railroad
> safety until the Secretary of Transportation prescribes a regulation
> or issues an order covering the subject matter of the State
> requirement.

49 U.S.C. § 20106.[4]

Where the statute being construed contains an express preemption clause, such as

§ 20106, "the task of statutory construction must in the first instance focus on the plain wording

of the clause."  <u>CSX Transportation, Inc. v. Easterwood</u>, 507 U.S. 658, 664 (1993).  The

provisions of the FRSA's preemption clause mandate that "applicable federal regulations may

preempt any state 'law, rule, regulation, order, or standard relating to railroad safety.'  Legal

duties imposed on railroads by the common law fall within the scope of these broad phrases." [5]

_____

[4]   The FRSA's preemption provision also contains a "savings clause" which allows a state "to adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety **but only when** "the law, regulation, or order - (1) is necessary to eliminate or reduce an essentially local safety hazard; (2) is not incompatible with a law, regulation, or order of the United States Government; and (3) does not unreasonably burden interstate commerce."  49 U.S.C. § 20106.

[5] The defendant acknowledges that the plaintiff's claim against it is based on the FELA, and that, technically speaking, the Supremacy Clause does not form the basis for preclusion of a FELA-based common law claim.  However, courts have consistently precluded injured railroad workers' FELA claims against their railroad employers based on the same principles and theories argued herein.  For instance, in <u>Thirkill vs. J. B. Hunt Transp., Inc.</u>, 950 F.Supp. 1105 (N.D. Ala. 1996), an FELA excessive train speed claim was precluded on the basis of FRSA preemption and national uniformity principles; <u>Rice v. Cincinnati, New Orleans & Pac. Ry. Co.</u>, 955 F. Supp. 739 (E.D. Ky. 1997).  In <u>Waymire v. Norfolk and W. Ry. Co.</u>, 218 F.3d 773, 777 (7th Cir. 2000), the 7th Circuit Court of Appeals held that the FRSA precluded the plaintiff's FELA claim:

> To treat cases brought under federal law differently from cases brought under state law would defeat the FRSA's goal of uniformity.  It would deny recovery to the motorist struck by the train, but not to the engineer operating the train.  We do not believe that is the result envisioned by the statute or by the Supreme Court's decisions.  To the extent that the FELA, then, is inconsistent with the FRSA on the issues of train speed and warning devices at grade crossings, we hold that the FRSA supersedes the FELA.

More recently, in <u>Herndon v. National R.R. Passenger Corp.</u>, 814 A.2d 934 (D.C. 2003), the D.C. Circuit held that:

> It is true that the case before us differs from <u>CSX Transp. Inc. v. Easterwood</u> in that Herndon's suit is brought under the FELA rather than state common law, and thus pre-emption in its constitutional sense

Id; *see also* Ouellette v. Union Tank Car Co., 902 F. Supp. 5, 9 (D. Mass. 1995).  Regulations will have preemptive effect where they "substantially subsume the subject matter of the relevant state law."  Ouellette, 902 F. Supp. at 9, *quoting* Easterwood, 113 S. Ct. at 1738.

Railroad equipment and railroad operations are governed by a comprehensive scheme of federal statutes and their implementing regulations.  These statutes include the *Safety Appliance Act* ("SAA"), the *Locomotive Inspection Act* ("LIA") and the FRSA.  Congress enacted the SAA between 1893 and 1910.  *See* 49 U.S.C. § 20301, *et seq*.  The primary purpose of the SAA was to require standardized equipment on all railcars.  Lilly v. Grand Trunk R. Co., 317 U.S. 481, 486 (1943).

It is clear that the FRSA and its preemption provision apply to <u>any and all regulations pertaining to railroad operations and railroad safety</u>, whether enacted before or after the FRSA (such as the SAA). *See, e.g.,* CSX Transp., Inc. v. Public Utilities Comm'n of Ohio, 901 F.2d 497, 501 (6th Cir. 1990) ("FRSA preemption relates to all rules and regulations regarding railroad safety promulgated by the Secretary, whether or not such regulations are promulgated by the FRA through power delegated by the Secretary."); Consolidated Rail Corp. v. City of Bayonne, 724 F.Supp. 320 (D.N.J.1989); *see also* Tolentino v. United Parcel Service, et al., 2001 U.S. Dist. LEXIS 1395 (D. Mass. 2001).

---

does not apply.  However, we agree with the federal circuit court cases that have found this to be a distinction without a policy difference.

Several Federal Courts, including two circuit courts of appeal, have held that FELA claims alleging negligent design of locomotives are precluded by federal regulations.  Oglesby v. Delaware & Hudson Ry. Co., 180 F.3d 458 (2nd Cir. 1999); McGinn v. Burlington N. R. Co., 102 F.3d 295 (7th Cir. 1996); Key v. Norfolk S. Ry. Co., 491 S.E.2d 511 (Ga. App. 1997); Sindoni v. Consol. Rail Corp., 4 F.Supp.2d 358 (M.D. Pa. 1996).  The same principles apply with equal force to both FELA and state-based common law claims.  In Norfolk S. v. Denson, 774 So.2d 549 (Ala. 2000), the Supreme Court of Alabama precluded the FELA claims of two locomotive crewmen who were burned in a grade crossing accident, citing the FRSA's principle of uniformity.

The SAA and its implementing regulations established uniform national requirements for "safety appliances" on railroad cars. The appliances (such as hand and power brake systems, running boards, handholds, grab irons, sills and railings) are designed for the protection of railroad employees and others. The SAA also requires the federal government to set standards for safety appliances on railroad cars with the "intent to secure uniform equipment on [freight] cars." Baltimore & Ohio R. Co. v. Jackson, 353 U.S. 325, 340 (1957). Thus the federal government has, through the SAA, continuously specified the type of safety equipment required on rail cars operating in interstate commerce, supplementing the initial SAA requirements. Equipment not specifically referenced in acts or regulations is not covered under the SAA. The United States Supreme Court has consistently held that the SAA, and regulations promulgated pursuant to the Act, preempt the *entire field* of safety appliances on rail cars and prohibit the states from requiring "greater or less or different equipment." Southern Ry. Co. v. Railroad Comm's of Indiana, 236 U.S. 439, 446 (1915).

Federal law clearly preempts the plaintiff's claims regarding the stirrup/sill. The FRA has adopted extremely detailed and comprehensive regulations, pursuant to the SAA's authority, discussing, with excruciating specificity, the safety appliances with which all types of railroad cars must be equipped – these regulations are known as the FRA's Railroad Safety Appliance Standards and are codified at 49 C.F.R. § 231 *et seq*. These regulations specifically describe the number, type, dimensions and location of sills with which various types of tank cars must be equipped. See 49 C.F.R. §§ 231.7, 231.8, 231.9 and 231.21.

The tank car SHPX 201016 had been inspected on a regular basis prior the plaintiff's alleged accident, and on August 16, 2002, the day following the plaintiff's alleged accident, the car was inspected, including the stirrups/sills and no defects or problems were found. Therefore,

any argument the plaintiff may attempt to argue regarding the design of said stirrup or sill is preempted, and any evidence about this issue should be excluded.

The plaintiff's "design defect" theory is almost identical to the theory which this Honorable Court correctly rejected in <u>Ouellette</u>.  In <u>Ouellette</u>, the plaintiff brought claims against Union Tank Company ("UTC"), alleging that UTC provided and inadequate safety appliance (a handrail) on a tank car, causing her to slip off the tank car while attempting to dismount. <u>Id</u>. Specifically, she alleged that her fall was a result of an ill-placed handhold, and that a side railing would have been safer.  This Honorable Court held that 49 CRR § 231 clearly governed the design and/or placement of safety appliances on tank cars, and that all the plaintiff's claims against the UTC were preempted regardless of whether the placement of the handrail was in compliance with the federal regulations, citing the *Supremacy Clause* and the FRSA. <u>Id</u>.  There is no reason why the same result should not be reached here.

**3.     Implied/Field Preemption Under The FRSA**:

Preemption is implied where federal law evinces Congress' intent to occupy the field of a particular subject matter.  "Where Congress intends to occupy a field, state law in that field is preempted."  <u>Springston v. Consolidated Rail Corporation</u>, 130 F. 3d 241, 244 (6th Cir. 1997). Implied preemption exists when:

> "The scheme of federal regulation ...(is)...so pervasive as to make reasonable the inference that  Congress left no room for the state to supplement it," because "the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the subject," or because "the object sought to be obtained by federal law and the character of obligations imposed by it may reveal the same purpose."

<u>Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta</u>, 458 U.S. 141, 153 (1982) *quoting* <u>Rice v. Santa Fe Elevator Corp.</u>, 331 U.S. 218, 230 (1947).  Here, Congress has explicitly declared that the

purpose of the FRSA "is to promote safety in every area of railroad operations."  49 U.S.C. §
20101.

The Congressional intent behind the FRSA and the very creation of the FRA was to
regulate, and therefore "cover," the broad subject of railroad safety.  *See* 45 U.S.C. § 421; 49
U.S.C. § 20101.  As originally enacted, the FRSA provided that the Secretary:

> shall (1) prescribe, as necessary, appropriate rules, regulations, orders, and
> standards <u>for all areas of railroad safety</u> supplementing provisions of laws and
> regulations in effect on the date of the enactment of this title, and (2) conduct, as
> necessary, research, development, testing,     evaluation, and training <u>for all areas
> of railroad safety</u>.

45 U.S.C. § 431, 84 Stat. 971, Pub. L. 91-458 § 202 – Oct. 16, 1970 (emphasis supplied).  In
prescribing rules, regulations and standards under the FRSA, "the Secretary shall consider
relevant existing safety data and standards."  <u>Id</u>.

The FRSA's legislative history clearly reveals:  (1) Congress' concern for uniform,
national rail safety standards; (2) its intent that the FRSA "preempts the field" of railroad safety;
and (3) that the Secretary of the DOT has been conferred broad authority to regulate every aspect
of railroad safety.[6]  This history also leaves little doubt that Congress intended that the federal
regulations cover the subject of railroad tank car design.

Recognizing that OSHA was free to exercise jurisdiction with respect to conditions not
related to railroad operations, the FRA affirmatively stated that "as the primary regulatory
agency concerned with railroad safety, the FRA will not hesitate to adopt its own standards to
assure a safe environment for railroad operations and to promote regulatory consistency."  <u>Id</u>. at
10587.  In making this distinction, the FRA made several specific affirmative statements which

---

[6]  Specifically, the House Report stated that: "[a]t the present time where the Federal Government has authority,
with respect to rail safety, <u>it preempts the field</u>."  H.R. Rep. 1194, 91st Cong., 2nd Sess., 11, reprinted in 1970
U.S.C.C.A.N. 4108-4109 (emphasis added).

demonstrated its exclusive authority to regulate working conditions as they pertained to the safety of railroad operations.[7]  These statements unequivocally demonstrate that the FRA has had complete and exclusive authority over the design of all railroad equipment, including locomotive seats.

Under the doctrine of implied preemption, it does not matter that the Secretary has not actually enacted a regulation governing the specific theory of negligence alleged by a plaintiff's common law claim - it is enough that the Secretary had the authority, under the federal scheme, to enact such a regulation, but chose not to do so.  In such a case, that the DOT "has not seen fit to exercise its authority to the full extent conferred, has no bearing upon the construction of the act delegating the power."  Napier, 272 U.S. at 613.[8]  The FRA's decision not to issue a regulation concerning stirrups on tank cars should be heard as loudly as a decision to specifically do so:  "a federal decision to forego regulation in a given area may imply an authoritative federal determination that the area is best left unregulated, and in that event would have as much preemptive force as a decision to regulate."  Arkansas Elec. Cooperative Corp. v. Arkansas Pub. Serv. Comm'n., 461 U.S. 375, 384 (1983).  Thus, if Congress intended to occupy a field, such as the regulation of railroad equipment, what might be called "negative preemption" (i.e. preemption by silence) applies with equal force as a regulation directly on point.  See Springston, 130 F. 3d at 245.  As stated by the Supreme Court:

---

[7] For instance, the FRA stated that OSHA regulations pertaining to walking-working surfaces would not apply to "the design of locomotives and other rolling equipment used on the railroad, since working conditions related to such surfaces are regulated by FRA as major aspects of railroad operations."  Id. at 10587.

[8] See also Oglesby v. Delaware and Hudson Ry. Co., 180 F. 3d 458, 461 (2d Cir. 1999) (the issue "is not whether the federal government has exercised its authority but whether it possesses the power [to do so] in the first place."); Southern Ry. Company, 236 U.S. at 448 ("The test…is not whether the state legislation is in conflict with the details of the Federal law or supplements it, but whether the state had any jurisdiction of a subject over which Congress had exerted its exclusive control").

the legislation of Congress, in what it does prescribe manifestly indicates that it does not intend that there shall be any further legislation to act upon the subject matter. Its silence as to what it does not do, is as expressive of what its intention is as the direct provisions made by it…the will of Congress upon the whole subject is as clearly established by what it had not declared, as by what it has expressed.

Southern Ry. Company, 236 U.S. at 446. Moreover, the FRA has specifically analyzed the design of locomotive seats and has affirmatively chosen not to require seatbelts; instead, all that is required is that the "seats be securely mounted and braced." 49 C.F.R. § 229.119(a). The common law cannot impose a more stringent requirement.

Implied preemption is much broader than expressed preemption under the FRSA. Whereas the expressed preemption clause of the FRSA is triggered when Congress "prescribes a regulation or issues an order covering the subject matter" of railroad safety, implied preemption covers all common law claims, whether or not a specific regulation has been enacted. Through exhaustive, overarching federal regulatory framework, Congress has essentially taken over railroad regulation and left nothing for the common law to regulate in this field. See Jordan v. Southern Ry. Co., 470 F.2d 1350, 1359 (4th Cir. 1992) ("the categories of safety appliances created by [the SAA]…should be broadly read to include every device falling within that category, even if the Secretary…has not seen fit to standardize a particular type or use of that device").[9]

---

[9] Public policy also militates in favor of preempting the plaintiffs' claims. The objective of the FRSA is to achieve national uniformity of railroad regulation. 49 U.S.C. §20106. This goal would be undermined if railroads, such as Penn Central and Conrail, were required to comply with different standards in different states. As described in the House Report concerning the enactment of the FRSA, "[t]he committee does not believe that safety in the Nation's railroads would be advanced sufficiently by subjecting the national rail system to variety of enforcement in fifty different judicial and administrative systems." H.R. Rep. 1194, 91st Cong., 2nd Sess., 11, reprinted in 1970, U.S.C.C.A.N. 4109. Courts have echoed this concern: "[i]f each state were to adopt different liability triggering standards, manufacturers would have to sell locomotives and cars whose equipment could be changed as they crossed state lines, or adhere to the standard set by the most stringent state. Furthermore, Congress' goal of uniform, Federal railroad regulation would be undermined." Law, 114 F.3d at 911 (citations omitted). The disruptive impact of the scenario in Law on interstate commerce and the operation of the interstate railroad system is so obvious that it needs no further explanation.

In recognition of the policy behind the FRSA, a number of courts have held that Congress has so pervasively legislated the subject of railroad safety, that there is no room for common law action in this regard.  In Ouellette, this Honorable Court ruled that the FRA's safety appliance regulations (49 C.F.R. § 231 *et seq.*) preempted state common law claims alleging the negligent design and placement of handholds on a railroad tank car: "the federal regulation substantially subsumes the subject matter of the design and placement of the handrail on the tank car, leaving no room for a private action based upon state law theories."  Id. at p.10.[10]  The court in Ouellette reasoned that:

> [b]y pervasively legislating the field of railroad safety, Congress demonstrated its intent to create uniform national standards and to preempt state regulation of railroads.... If state common law tort claims were permitted to proceed despite this Congressional intent... then manufacturers would inevitably be subjected to varying interpretations of the federal regulations in the different states....Inevitably, those tort actions would generate precisely those inconsistencies in railroad safety standards that Congressional action was intended to avoid.

Id. at 10 (citation omitted); *see also* Marshall, 720 F.2d 1149; Beenken v. Chicago & Northwestern R. Co., 367 F. Supp 1337 (N.D. Iowa 1973).  In Carillo v. ACF Industries, Inc., the Supreme Court of California held that the "statutes and their implementing regulations reflect a congressional intent to occupy the field regulating railroad safety appliances, thus precluding any state law directed to the same matter, including common law tort claims predicated on design defects."  2d Cal. 4th, 1158-1160 (Cal. 1999).  As stated by the Supreme Court in Southern Ry. Company, "the preemptive effect of the SAA did not relate merely to details of the statute and the penalties it imposed, but extended to the whole subject of equipping cars with appliances intended for the protection of employe[e]s."  236 U.S. at 446.  The Supreme Court has also

---

[10]  The plaintiff in Ouelette claimed that the tank car on which she was injured should have been equipped by hand holds which were not required by 49 C.F.R. part 231.

stated that Congress "has exercised its exclusive powers over interstate commerce so far as to take possession of the field [of railroad safety appliances], [and therefore] the States no more can supplement its requirements than they can allow them." Penna R.R. Co., 250 U.S. at 569; s*ee also* Gilvary, 292 U.S. at 50-66.

Should the court find that the stirrup/sill is not expressly identified in 49 C.F.R. § 231 such that express preemption applies, nevertheless it is clear that Congress has exercised its powers over safety appliances on railroad tank cars and, though these regulations completely subsumed the field of the design and placement of Safety Appliances on railroad tank cars. Thus, for this additional reason, plaintiff's claims alleging that the stirrup was defectively designed, must be preempted.

### III.    CONCLUSION:

WHEREFORE, for all the above-stated reasons the defendant's motion should be allowed, the Court should exclude all evidence relating to a design defect of the sill/stirrup attached to the tank car.

<div style="margin-left: 40%">

Respectfully submitted,
The defendants,
NEW ENGLAND CENTRAL RAILROAD, INC.,
by its attorneys,

/s/ Michael B. Flynn
Michael B. Flynn            BBO #559023
Valerie A. Murphy          BBO #661460
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169
(617) 773-5500

</div>

Dated: July 21, 2006
G:\F & A\CASE FILES\RAILAMERICA\New England Central\JONES, RICKEY A\pleadings\Motion in Limine - Exclude design of stirrup arg.doc

# EXHIBIT "A"

Rickey A. Jones
November 1, 2005

1

Volume I, Pages 1-319

Exhibits 1-11R

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

RICKEY A. JONES                        \*

            Plaintiff                  \*

vs.                                    \* No. 04-11772-MAP

                                       \*

NEW ENGLAND CENTRAL RAILROAD, INC.\*

            Defendant                  \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF:  RICKEY A. JONES

FLYNN & ASSOCIATES, P.C.

400 Crown Colony Drive, Suite 200

Quincy, Massachusetts

November 1, 2005   9:30 a.m.-3:50 p.m.


-----REPORTED BY: CHRISTINE SILVA-ADERMANN/RPR-----

BEACON HILL REPORTING

44 Bayswater Street

Boston, Massachusetts

617.569.8050    Fax 617.569.8150

**Rickey A. Jones**
**November 1, 2005**

(Pages 146 to 149)

146

1  motion with your right hand over your left almost as
2  if you are holding a baseball bat?
3      A. Correct.
4      Q. Go ahead.
5      A. I was sliding down to try to get my foot in
6  the stirrup. And just about the time I got my
7  weight into the stirrup, my hand slid off the car,
8  my foot slid out the stirrup towards the ground, and
9  I landed back on my right leg, and it collapsed
10 underneath me.
11     Q. So you were reaching down and around to try
12 to get your right foot into the stirrup?
13     A. No.
14     Q. What was wrong about what I just said?
15     A. No. The right foot.
16     Q. Did I say left?
17     A. It should have been the left.
18     Q. Oh, I see. You are holding onto the
19 railing as if holding onto a baseball bat. You are
20 holding onto it at about the level of where your
21 face was?
22     A. Roughly.
23     Q. Then where was your right foot at that
24 point in time?

147

1      A. It was on the angle iron which is by the
2  brake housing. I think it was the brake housing was
3  on that end of the car.
4      Q. This is above the track?
5      A. Correct.
6      Q. Is it on the opposite side of that railing
7  that you are holding onto like a baseball bat?
8      A. Correct.
9      Q. So now you are almost straddling that
10 railing?
11     A. That's the only way to get off that car.
12     Q. That railing essentially extends up from
13 the angle iron vertically up until it bends and goes
14 horizontal; correct?
15     A. Correct. About three and a half, four
16 feet.
17     Q. You swing around, you got your hands on the
18 railing, and your right foot is now on the angle
19 iron; correct?
20     A. Correct.
21     Q. Your right foot does not slip at that time;
22 correct?
23     A. No, sir.
24     Q. Now, you start to reach down with your left

148

1  foot; correct?
2      A. Yes, sir.
3      Q. And you said at that point your left foot
4  is sliding down, is that how you described it?
5      A. No. My right foot was secure on the top of
6  the car.
7      Q. No problem slipping with the right foot?
8      A. No, sir. I was putting my foot down to get
9  in the stirrups but the stirrup is at such an angle
10 on that car that it's hard. Instead of being on a
11 regular boxcar or hopper car where they are straight
12 up and down, they actually come out to you. These
13 are they sit on probably, I don't know, three and a
14 half inches back further.
15     Q. It's angled back into the track?
16     A. So you have to dig down and put your body
17 in a really awkward position to get to it.
18     Q. That's the way the stirrup is designed by
19 the car manufacturer; correct?
20     A. The SHPX.
21     Q. Right. You agree with me?
22     A. Correct.
23     Q. It's not because it was defective or bent?
24     A. No. They're all like that.

149

1      Q. That's how they come brand new?
2      A. I don't know.
3      Q. It's the way that all of them that you've
4  seen?
5      A. From what I remember, yes.
6      Q. On these type of tank cars?
7      A. From what I remember.
8      Q. And it's not your position in this case
9  that that stirrup was somehow bent or misshapen in
10 any way, shape, or form?
11     A. I honestly don't know. It could have been.
12 They sit on such a nasty angle.
13     Q. Now, what happened while you were -- what
14 happened now with your left foot to get on the --
15 you were trying to get on the bottom rung in that
16 stirrup?
17     A. Yes, sir.
18     Q. There is only two rungs to that stirrup?
19     A. I don't know if there is one or two.
20     Q. One's about 20 inches off the track bed?
21     A. I know you can't get but one foot on the
22 rung itself.
23     Q. Okay. It's about 20 inches above the track
24 bed, would you say?

38

Rickey A. Jones
November 1, 2005

---

182

1 yard, you cannot stop picking up motor oil. My
2 gloves had white powder on them. When Nathaniel
3 Cobb helped me up, I cleaned myself off.
4    Q. Your boots had evidence of these conditions
5 on them?
6    A. Yes, sir.
7    Q. What specifically was on them?
8    A. Rotten grain and I know motor oil was
9 because this was on the tip of my boot.
10   Q. You had rotten grain on the bottom of your
11 boots?
12   A. Yes, sir.
13   Q. Anything else?
14   A. Not on my boots, no.
15   Q. So it's just rotten grain?
16   A. Yes.
17   Q. So there was motor oil on the tip of your
18 boot?
19   A. Yes, sir. That's what I can remember.
20   Q. Not on the sole?
21   A. That's what I can remember. On the tip of
22 the sole underneath at the tip of the boot.
23   Q. What part of your sole actually slipped off
24 the stirrup?

---

183

1    A. I had my foot on the stirrup so about arch
2 deep it started sliding off.
3    Q. You didn't have your heel of your boot
4 wedged in?
5    A. You can't.
6    Q. Why not?
7    A. Because of the angle they put the stirrup.
8    Q. Okay.
9    A. It put your body mechanics at such an
10 awkward position you can't get your foot in there
11 correctly.
12   Q. So it was somewhere around the arch of your
13 foot that you were actually contacting the stirrup?
14   A. Yes, sir.
15   Q. So kind of the middle of the sole of your
16 boot; is that what you're saying?
17   A. Yes, sir. Towards the heel.
18   Q. Towards the heel. But the middle?
19   A. Yes, sir.
20   Q. Where was the motor oil?
21   A. That was on the front. Can I show you?
22   Q. Yes.
23   A. It was in this area from throwing the
24 switch.

---

184

1    Q. So that part wasn't -- what you've
2 basically shown me is --
3    A. Grain was on both of my boots.
4    Q. Hold on. But the motor oil was underneath
5 the toe portion of the sole of your left foot;
6 right?
7    A. Yes, sir.
8    Q. Of your left foot, right?
9       MR. MYERS: You lost me on that one.
10   Q. The boot you've been talking about is your
11 left boot; right?
12   A. Yes, sir.
13   Q. Correct?
14   A. Correct.
15   Q. Are you saying it was the grain on your
16 boot that caused you to slip off the stirrup?
17   A. I'm saying it could have been a compilation
18 of both.
19   Q. The only thing you saw was grain in the
20 area of the sole of your boot that actually came in
21 contact with the stirrup; is that fair to say?
22   A. Yes.
23   Q. The motor oil was there, but that wasn't on

---

185

1 the part of your sole that actually slipped of the
2 stirrup?
3    A. I don't know. I flopped around in the dirt
4 trying to get up.
5    Q. Did you say anything about rotten grain or
6 motor oil in your personal injury report, Exhibit 6?
7    A. I said my foot slipped out.
8    Q. Did you say anything about rotten grain or
9 motor oil?
10   A. It didn't ask me why.
11   Q. But you are telling me here today about all
12 these conditions that you were concerned about;
13 right?
14   A. Yes, sir.
15   Q. And you made reports about them before,
16 even when you weren't hurt; right?
17   A. Yes, sir.
18   Q. But here you are hurt filling out a
19 personal injury report on August 15, 2002. Now you
20 are saying it was caused by these awful conditions,
21 but you never said anything in your report about it,
22 did you?
23   A. I guess not.
24   Q. You never said anything in the statement

---

**Rickey A. Jones**
**November 1, 2005**

(Pages 186 to 189)

---

**186**

1 that you gave to Mr. Ogden, did you?
2    A. I don't remember that.
3    Q. I'm going to show you your statement to Mr.
4 Ogden. I'm going to show you a transcript of it.
5 I'm going to ask you to review it, and then once
6 you've had an opportunity to -- we'll take a break
7 while you are doing that. Let me know when you
8 completed it; okay?
9    A. Okay.
10       MR. FLYNN: It's going to take you a
11 while. It's a few pages.
12       MR. MYERS: I can make a phone call?
13       MR. FLYNN: Sure.
14       (Break taken)
15       MR. FLYNN: Let's have the transcript of
16 the statement marked as Exhibit 7.
17       (Marked, Exhibit 7, Transcript of
18 Statement)
19    Q. Sir, you've now had an opportunity, about a
20 half-hour, to read a statement you gave to Mr. Ogden
21 August 21, 2002; right?
22    A. Yes.
23    Q. That statement has been marked as Exhibit
24 7?

---

**187**

1    A. Yes, sir.
2    Q. Having read it, does it refresh your memory
3 that you gave that statement back in August 2002?
4    A. No.
5    Q. You agree with me having read it, you
6 didn't say anything in this statement about any of
7 those conditions which you've described today at the
8 deposition, did you?
9    A. Well, I described the slipping.
10    Q. All you said in the statement was that you
11 slipped; correct?
12    A. Yes.
13    Q. You didn't say anything about rotten grain,
14 did you?
15    A. No, I didn't.
16    Q. You didn't say anything about motor oil
17 being used on switches, did you?
18    A. I didn't have to.
19    Q. Just yes or no. Did you say anything about
20 motor oil being used on switches?
21    A. No, sir.
22    Q. Did you say anything about motor oil on
23 your boots?
24    A. I don't remember reading about it.

---

**188**

1    Q. Did you say anything about rotten grain on
2 your boots?
3    A. No, sir.
4    Q. Did you say anything about grease from
5 locomotives?
6    A. No, sir.
7    Q. Did you say anything about grease from
8 cars?
9    A. No, sir.
10    Q. Did you say anything about slurry?
11    A. No, sir.
12    Q. Did you say anything about any of these
13 conditions being all over the yard as you described
14 here at your deposition?
15    A. No, sir.
16    Q. This statement was taken six days after
17 your accident; correct?
18    A. Yes, sir.
19    Q. This statement was taken before you sought
20 the services of counsel; correct? In other words,
21 before you hired a lawyer; right?
22    A. Yes, sir.
23    Q. When did you hire a lawyer, by the way?
24    A. I don't really remember the date.

---

**189**

1    Q. Earlier in response to one of my questions
2 about the volleyball incident, you said, geez, it
3 was four or five years ago, it was hard to remember;
4 right?
5    A. I had a couple of drinks that day so it
6 made it a little more difficult.
7    Q. Were you drunk at the time of the
8 volleyball incident?
9    A. No.
10    Q. You had a couple of drinks?
11    A. Yes.
12    Q. So that made it even more difficult to
13 remember?
14    A. Yes.
15    Q. Was there anything about this statement
16 which made it difficult to remember?
17    A. Yes, sir.
18    Q. What was that?
19    A. I had been on painkillers. I told him that
20 before he started recording.
21    Q. What painkillers were you taking?
22    A. Percocet, I think it was.
23    Q. Did that affect your ability to remember
24 what had happened six days earlier?

48

# EXHIBIT "B"

1. Railroad :                    'ECR                    2. Case/Incident Num:                    PI 001

(*If Hazmat Involved)         yes ☐    no ☐    FAX 610-458-7448
Environmental Claims Administrators, Inc. (24 hour no.)    Bill Hoffman    (800) 432-2481    ATTN: Bill Hoffman
mployees involved:    1) R.A. Jones         2) N Y Cobb         3)
                       (injured employee)

Years experience at this work:    1) 1 yr. - 6 mos.    2) 4 years    3)

Reasonable cause testing:    1) yes ☒  no ☐    2) yes ☐  no ☒    3) yes ☐  no ☐

## INJURED EMPLOYEE INFORMATION

3. Last Name, First Name, Middle Initial
Jones Rickey A.

4. Home Street Address(include Apt. No.)    5. City         6. State    7. ZIP
23 Depot Street                Swanton          VT      05488

8. Home Telephone(include area code)    9. Date of Birth    10. Sex (M/F)    11. Social Security Number
(802) 868-2051              11-17-74      M         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

12. Name of Facility Where Employee Normally Reports
St. Albans Engine House

13. Facility Street Address         14. City      15. State    16. ZIP
Lower Hoyt Street           St. Albans    VT      05478

17. Date Hired         18. Job Title         19. Department Assigned
4-28-2002          Conductor         Transportation

### ACCIDENT/INCIDENT/EXPOSURE DESCRIPTION

20. Specific Injury Site                21. Weather Conditions/Temperature
Track 109 switch S.E. Italy Yard          Clear    86°

22. City         23. County         24. State    25. ZIP
St. Albans    Franklin         VT      05478

26. Is this on your premises?  Yes    27. Date of Occurrence    28. Time Shift Began    29. Time of Occurrence
30. Was Employee On Duty?  Yes    8-15-2002         1600         1925

31. Date that Employee Notified    8-15-2002    32. Time that Employee Notified    19:30
Company Personnel of Condition              Company Personnel of Condition

33. Person Notified
Dispatcher JDB / W.L. Magee A&M

Has this employee been injured previously within duties for this railroad?    no

If yes, when, and what type of injury?    n.a.

34. Describe the General Activity this person was engaged in prior to injury/illness.

Switching operations.

35. Describe all factors associated with this case that are pertinent to an understanding of how it occurred. Include a discussion of the sequence of events leading up to it, and the tools, machinery, processes, material, environmental conditions, etc, involved.

Pulling three empties out of S.E. of track 8 with intent of moving cars to track 9. Mr. Jones dismounted car @ 109 switch. Employee states that the car was not moving when he dismounted.

3. Describe in detail the injury/condition that this person sustained. Include a discussion of the body parts affected. If this is a recurrence, list date of last occurrence. Right knee soft tissue sprain. This is a recurrence of an off duty injury.

**Railroad Employee Injury And/Or Illness Record**          Form PI 001

RailTex Initial Incident Notification Form

*Dismounting Car # SHPX 201016*

7. Identify all persons and organizations used to evaluate and/or treat the condition. (Include facility, provider, and address)

*North Western Medical Center / ER*

8. Describe all procedures, medications, therapy, etc., used/recommended for the treatment of condition.

*rest, no prolonged standing, walking, bending for 2 x week.*

9. Answer yes or no to any of the following consequences resulting from this injury/condition:

| | |
|---|---|
| *Yes* | Restriction of work. Total days of restricted activity: *4* as of: *8/15/02* (date) |
| | Occupational illness. Date of initial diagnosis: |
| | Instructions to obtain prescription medication, or receipt of prescription medication |
| *Yes* | Missed a day of work or next shift. Actual days absent from work: *1/2* as of: *8/15* (date) |
| *ER* | Medical Treatment. (This includes any medical care or treatment beyond "first aid" that is given, or should have been given, regardless of who provided the treatment. "First Aid" treatment is limited to very simple procedures, e.g., application of a band-aid on minor scratches, cuts, abrasions, etc.) |
| | Transfer to another job or termination of employment |
| | Hospitalization for treatment as an inpatient. |
| | Multiple treatments or therapy sessions. |
| | Loss of conciousness. |
| | Death. Date of: _____ |

If any of the above consequences occurred, the injury/condition is almost always reportable to FRA on Form FRA F 6180.55a. you believe this case does not meet the reporting criteria, you must give a brief explanation below of the basis for this decision. as the case reported?   *Yes*

. Has this employee been given an opportunity to review his or her file?   *Yes*

. Preparer's Name          *Wm Magee*

. Telephone Number         *(802) 522-3416*        43. Preparer's Title, *A G M*
                                                    45. Date   *8/15/2002*

effective 10/20/99, for all PI Incidents

form meets criteria for FORM FRA F 6180.98

# EXHIBIT "C"

# EQUIPMENT OR FACILITY
## REPORT OF INSPECTION

PI 010

| Date of Inspection | Time of Inspection | Location of inspection |
|---|---|---|
| 8 16 2002 | 08:20 | NECR YARD |

| Inspected By: (Full Name of Person in Charge) | Job Title |
|---|---|
| THOMAS TOZZER | CMO - NECR |

| Identify Type of Equipment or Property | Number of Equipment (If known) |
|---|---|
| CAR - TANK | SHPX 201016 |

| Reason for Inspection: | X Injury | Rail Accident | Other |
|---|---|---|---|

**State Condition of:**

Couplers (Name and Style)
SE60DE - GOOD

Brakes (Name and Style)
ABDX - SHOES GOOD - HAND BRK GOOD

Ladders, Running Boards and Platforms:
GOOD

List all other Parts or Equipment inspected and state condition of each:

ALL SAFETY APPLIANCES - CHECK

ALL WHEELS - CHECK

What repairs were made to equipment: (List all repairs on each piece of equipment)

NONE

| Signature of Inspector: | Title: | Social Security Number: |
|---|---|---|
| AW Ampt | CMO.-NECR | |

| Signature of Inspector: | Title: | Social Security Number: |
|---|---|---|
| | | |

| Signature of Inspector: | Title: | Social Security Number: |
|---|---|---|
| | | |