UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

RICKEY A. JONES,
        Plaintiff,

v.

NEW ENGLAND CENTRAL RAILROAD, INC.,
        Defendant.

Civil Action No.: 04-11772-MAP

### NEW ENGLAND CENTRAL RAILROAD, INC.'S MOTION IN LIMINE TO ADMIT EVIDENCE OF THE PLAINTIFF'S RECEIPT OF COLLATERAL SOURCE BENEFITS

The New England Central Railroad, Inc. ("NECR") moves, *in limine*, that this Honorable Court admit evidence of the plaintiff's: (1) receipt of disability benefits from the Railroad Retirement Board ("RRB"); (2) receipt of wage continuation benefits from the NECR; and (3) receipt of the dollar amounts of such benefits, under an applicable and well established exception to the "collateral source" rule. *See* McGrath v. Consolidated Rail Corporation, 136 F.3d 838 (1st Cir.1998); *see also* Corsetti v. Stone Co., 396 Mass. 1, 16-21, 483 N.E.2d 793 (1985).

The defendant states that such evidence is necessary and appropriate in the unique circumstances of this case in order for the jury to assess more fully the believability of the plaintiff, whose credibility represents a sharply contested issue at the trial and a major factor among the defendant's defenses.

In the McGrath case, the First Circuit expressly recognized that the *Collateral Source Rule* "is not absolute and courts have carved out exceptions to the collateral source doctrine." Id. at 840. The court, in upholding the trial judge's decision to allow into evidence the plaintiff's receipt of disability benefits, acknowledged that the plaintiff's receipt of such benefits was

relevant on the issue of malingering/credibility under a Fed. R. Evid. 403 balancing analysis: "Conrail offered the evidence of [the plaintiff]'s disability payments on the issue of [the plaintiff]'s credibility. Specifically, Conrail presented collateral source evidence to show [the plaintiff's] lack of motivation for returning to work." Id. at 841. Under these particular circumstances, collateral source evidence should be admitted where it presents little likelihood of prejudice to the plaintiff: "if there is little likelihood of prejudice and no strong potential for improper use, and a careful qualifying jury instruction is given, then receipt of compensation benefits may be admissible for the limited purpose of proving another matter." Id. at 841 *quoting* Simmons v. Hoegh Lines, 784 F.2d 1234, 1236 (5th Cir.1986); *see also*, Moses v. Union Pacific Railroad, 64 F.3d 413 (8th Cir.1995)(allowing collateral source evidence where plaintiff's case itself has made the existence of such evidence of probative value); Santa Maria v. Metro-North Commuter Railroad, 81 F.3d 265 (2nd Cir.1996)(holding collateral source evidence admissible if plaintiff puts financial status at issue).

The First Circuit also distinguished the Supreme Court's decision in an earlier, seemingly conflicting FELA case, Eichel v. New York Central R.R., 375 U.S. 253 (1963), as pre-dating the adoption of the *Federal Rules of Evidence* and as not mandating a rule that collateral source evidence should be treated as being per se inadmissible. McGrath 136 F.3d. at 841; *see also* DeMedeiros v. Koehring Co., 709 F.2d 734, 740 (1st Cir.1983) ("[I]n Eichel, moreover, as Justice Harlan pointed out in his concurrence, the narrower question was simply whether or not to uphold the district court's discretionary ruling"); Gates v. Shell Oil, 812 F.2d 1509, 1513 and n.3 (5th Cir. 1987) (citing "[o]ther courts [which] have carved out exceptions to … Eichel," and concluding that "the decision to admit or exclude evidence of [collateral] LHWCA benefits under Rule 403, Fed. R. Evid., rarely is beyond the trial court's discretion"). In McGrath, the

2

First Circuit concluded that the Supreme Court in <u>Eichel</u> "simply determined that the district court abused its discretion because the prejudicial impact of the evidence outweighed its probative value. Here, we come to the opposite conclusion." <u>McGrath</u>, 136 F.3d, at 841.

Collateral source benefits are also admissible to prove the plaintiff lacked the motivation to return to work, and in effect was malingering, that is feigning [sickness or any] physical disability to avoid work and to continue receiving disability payments. *See e.g.,* <u>McGrath</u>, 136 F.3d 838. In this case, it is undisputed that the plaintiff received wage continuation payments from August 2002 to March 2003 and then again from July 2003 to January 2004, he received RRB benefits from March 2004 to November 2004. *See* transcript of the plaintiff's deposition, copies of the relevant portions of which are attached as Exhibit "A," at p. 263-266. The plaintiff has also admitted that he has made no attempt to return to his railroad work since his accident, even though he confirms that he could work as an engineer, trainmaster, dispatcher or other office position. Exh. A at p. 65, 250-254. Moreover, the defendant has offered the plaintiff a dispatcher's position and he turned it down, even though this job would have paid a higher wage than the trainman's position he held at the time of his accident. <u>Id.</u> at p. 250. The plaintiff also has failed to seek vocational training through the NECR. <u>Id</u>. at p. 249. The plaintiff also knows that the NECR and its parent company have other positions at other short-line railroads, but he has failed to do anything to get back to work in the railroad industry even though he believes that he could do the work in various jobs that pay as well as or better than his previous trainman's job. <u>Id</u>. at p. 253-254.

Further, the plaintiff is claiming the following: (1) he cannot get divorced from his wife because he does not have the money, and had he not been injured then he would have the funds to obtain the divorce; (2) he has been unable to travel to Vermont from Florida to clean out his

locker at the NECR, because he does not have the money; (3) he cannot see the doctor for additional care for his knee, because he does not have any money; (4) he could not afford to live in Vermont after the accident due to the dramatic reduction in his income; and (5) he can no longer afford to financially pay for things he used to do before the accident. Id. at p. 90-91, 197, 243-244, 262.

The plaintiff has a significant work capacity (in direct contradiction of his claim that he is permanently and totally disabled) yet he has failed, for whatever reason, to attempt to return to railroad work even though he admits he is capable of performing the activities required of these jobs. The medical evidence will demonstrate that the plaintiff is not permanently disabled. Given these facts, the defendant is entitled to introduce evidence of the plaintiff's receipt of collateral source benefits in order to impeach his disability claim and to prove he is malingering.

WHEREFORE, for all the above-stated reasons, the defendant's *Motion in Limine* should be allowed.

          Respectfully submitted,
          The defendant,
          NEW ENGLAND CENTRAL RAILROAD, INC.,
          by its attorneys,

          /s/ Michael B. Flynn
          Michael B. Flynn    BBO #559023
          Valerie A. Murphy    BBO #661460
          FLYNN & ASSOCIATES, P.C.
          400 Crown Colony Drive, Suite 200
          Quincy, MA 02169
          (617) 773-5500

Dated: July 21, 2006
G:\F & A\CASE FILES\RAILAMERICA\New England Central\JONES, RICKEY A\pleadings\Motion in Limine - Admissibility of Collateral Source Benefits.doc

# Exhibit "A"

1

Volume I, Pages 1-319

Exhibits 1-11R

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

*****************************************

RICKEY A. JONES                         *

       Plaintiff                        *

vs.                                     * No. 04-11772-MAP

                                        *

NEW ENGLAND CENTRAL RAILROAD, INC.*

       Defendant                        *

*****************************************

DEPOSITION OF:  RICKEY A. JONES

FLYNN & ASSOCIATES, P.C.

400 Crown Colony Drive, Suite 200

Quincy, Massachusetts

November 1, 2005   9:30 a.m.-3:50 p.m.


-----REPORTED BY: CHRISTINE SILVA-ADERMANN/RPR-----

BEACON HILL REPORTING

44 Bayswater Street

Boston, Massachusetts

617.569.8050    Fax 617.569.8150

Rickey A. Jones
November 1, 2005

(Pages 62 to 65)

**Page 62**

1  Q. Back when you were living in Clewiston and
2  you worked at South Central Florida Express, where
3  did you fill your prescriptions?
4  A. I really don't know. I'm not too big of a
5  pill taker.
6  Q. Where do you fill your prescriptions now?
7  A. I don't.
8  Q. You are not currently taking any drugs?
9  A. No, sir.
10     MR. MYERS: For the record, he has no
11  medical insurance. There is no prescription
12  medication coverage.
13  Q. Is that why you are not taking any
14  prescription medications at this time?
15  A. Yes, sir.
16  Q. If you had coverage, you would be taking
17  some?
18  A. Probably.
19  Q. We'll get back to it in a second. When did
20  your coverage run out?
21  A. Whenever RailAmerica turned it off.
22  Q. Prior to that, were you living in Florida?
23  A. Excuse me?
24  Q. Prior to that, were you living in Florida?

**Page 63**

1  A. Yeah.
2  Q. Where were you getting your prescriptions
3  filled at that time?
4  A. I don't remember. Actually I think I was.
5  Q. Where were you filling them at?
6  A. I was getting them from the doctor's office
7  if I'm not mistaken.
8  Q. Any other injuries at South Central Florida
9  Express?
10  A. Not that I recall.
11  Q. Other than injury claims, did you file any
12  claims of any other type with your union or anybody
13  else while at South Central Florida Express?
14  A. Not that I recall.
15  Q. You didn't file any claim due to the
16  problems you were having with Ms. Connolly?
17  A. No, sir.
18  Q. How much were you earning when you worked
19  for South Central Florida Express at the time you
20  left?
21  A. Close to 14 an hour I think. Somewhere
22  around there.
23  Q. How often when you were at South Central
24  Florida Express did you work as a yardmaster?

**Page 64**

1  A. I think I did it for a month.
2  Q. Did you receive training before you did
3  that job?
4  A. Yes, sir.
5  Q. Yardmaster's job consists of doing what?
6  A. There or?
7  Q. South Central Florida Express.
8  A. He was basically the dispatcher. But he
9  only had three or four trains moving at a time.
10  Q. As a dispatcher, basically he's on the
11  radio with the crews of those trains; correct?
12  A. Yes, sir.
13  Q. He's authorizing them where and when they
14  can make movements; right?
15  A. There it's kind of lenient. He's basically
16  the secretary for the trains.
17  Q. So he's keeping a record of their
18  movements?
19  A. Yeah.
20  Q. So the dispatcher there doesn't really have
21  a responsibility for giving them authority to travel
22  into and out of certain blocks?
23  A. No, sir.
24  Q. That's up to the crews themselves?

**Page 65**

1  A. Well, it's a piece of paper. It's a track
2  warrant that you write it out and you have it all
3  day.
4  Q. And that's how the traffic is controlled on
5  that railroad?
6  A. Yes, sir.
7  Q. By warrant?
8  A. Yes, sir.
9  Q. That job entails pretty much sitting at a
10  desk and filling out paperwork and talking on the
11  radio once in a while?
12  A. And phones.
13  Q. There's no physical component to that job?
14  A. Yes, sir.
15  Q. Do you think that you could do that job
16  today, job of a yardmaster given your physical
17  limitations?
18  A. Possibly.
19  Q. It's very similar in terms of physical
20  requirements to the job that you actually have?
21  A. Correct.
22     MR. MYERS: Do you mean that he has
23  today, the parts thing?
24     MR. FLYNN: Yeah.

Beacon Hill Court Reporting, Inc.
(617) 569-8050

17

Rickey A. Jones
November 1, 2005

(Pages 90 to 93)

**Page 90**

1  Q. Were you divorced in court down in Florida?
2  A. Yes, sir.
3  Q. Do you remember the name of the court?
4  A. I think it was Hendry County.
5  Q. Any children by that marriage?
6  A. Yes, sir.
7  Q. What are their names and ages?
8  A. One daughter, Kendall Brianne Jones.
9  Q. Kendall Brianne Jones. How old is she?
10 A. She'll be 9 on the 11th.
11 Q. Jessica has custody of her?
12 A. Yes, sir.
13 Q. The support that you pay is it for
14 Kendall's support?
15 A. Yes.
16 Q. That's ordered by the Hendry County Court?
17 A. Yes, sir.
18 Q. Now, you moved to divorce Sherry Jones;
19 right?
20 A. What do you mean?
21 Q. Have you tried to divorce her?
22 A. I don't have the money.
23 Q. You haven't filed any papers anyplace?
24 A. No.

**Page 91**

1  Q. The reason you don't is because you don't
2  have any money?
3  A. Yes, sir.
4  Q. Are you claiming that that is because of
5  the accident that you suffered while you were on the
6  New England Central Railroad?
7  A. I don't have any money. I mean, I'm not
8  making the money to get the divorce.
9  Q. Had you not gotten injured, would you have
10 had enough money to file for divorce?
11 A. Yes, sir.
12 Q. Had you planned to do that?
13 A. Yes, sir.
14 Q. Are you claiming in this case as part of
15 your damages that the accident has prevented you
16 from being able to afford going through with that
17 divorce?
18 A. I don't know. I mean, I haven't --
19    MR. MYERS: You mean, financial damages?
20 Q. One of his elements of damages. What I'm
21 trying to find out, sir, without you interrupting
22 Bob, are you saying that, for instance, one of the
23 things you're saying in this case is I have this
24 knee injury; right?

**Page 92**

1  A. Mm-mm.
2  Q. And that's caused by whatever happened to
3  you while working for the New England Central;
4  right?
5  A. Yes, sir.
6  Q. You know you are seeking compensation for
7  that knee injury; correct?
8  A. Yes, sir.
9  Q. Are you also saying that there are certain
10 thing that you can't do anymore because of the
11 accident?
12 A. Yes, sir.
13 Q. Are you also claiming that you're seeking
14 compensation for the fact that you are unable to
15 divorce your wife because you can't afford it?
16 A. Not that I'm aware of.
17    MR. MYERS: It's a matter of law he can
18 only ask financially for earnings past or future,
19 unpaid medical billings. I'm not aware that you can
20 seek -- if it is, let me know. We'll seek it.
21    MR. FLYNN: Okay. Fair enough.
22    MR. MYERS: I mean --
23    MR. FLYNN: I'm not talking about it on
24 direct.

**Page 93**

1     MR. MYERS: You got me confused.
2     MR. FLYNN: Maybe it will become clear.
3  Q. Do you own any property currently, sir?
4  A. No, sir.
5  Q. Have you in the last ten years?
6  A. Yes, sir.
7  Q. Where was that?
8  A. In Clewiston, Florida.
9  Q. What did you own down there?
10 A. It was a trailer.
11 Q. What kind of trailer?
12 A. House trailer.
13 Q. Where was that? What was the address?
14 A. I don't even remember. It was in a place
15 called Fox Briar in Clewiston.
16 Q. Is that a motor home park?
17 A. Yes.
18 Q. Back when you were married to Jessica
19 Jones?
20 A. No.
21 Q. When was that?
22 A. It was '99 maybe to 2000.
23 Q. You were working --
24 A. I sold it when I left.

24.

Rickey A. Jones
November 1, 2005

(Pages 194 to 197)

**194**

1  thing.
2  Q. Had you been to any union meetings
3  beforehand?
4  A. No. We never had one.
5  Q. Did you know Mr. Cobb was your local union
6  representative?
7  A. Yes.
8  Q. When you were there on the ground, did he
9  have any discussion with you about your rights as an
10 injured railroad employee?
11  A. No, sir.
12  Q. When was the first time you had a
13 discussion with anybody about that subject after
14 your August 15, 2002 incident?
15  A. I think it was after Mr. Ogden had called
16 me to offer or give me an offer.
17  Q. When was that?
18  A. It was after my second -- after the second
19 time I got hurt.
20  Q. After the second time you got hurt?
21  A. Well, the reinjury.
22  Q. First time you went to speak to a lawyer to
23 represent you, was that before or after the second
24 incident?

**195**

1  A. I went to speak to a lawyer?
2  Q. Had any contact with a lawyer?
3  A. Right after that.
4  Q. Right after the second incident?
5  A. After I got off the phone with Dick Ogden.
6  Q. With respect to the incident itself at
7  South Central, what was the employee's name that
8  lost his arm?
9  A. Dale Richardson.
10  Q. Did he sue under FELA?
11  A. Yes, sir.
12  Q. Did that case go to trial?
13  A. I don't know. I was just a witness.
14  Q. Did you give testimony at a deposition in
15 that case?
16  A. Yes, sir.
17  Q. Who was the Mr. Richardson's lawyer?
18  A. I think his last name was Moody.
19  Q. Moody?
20  A. I think so.
21  Q. Is that from the Moody Strople firm?
22  A. I have no idea.
23  Q. Do you know what town he was from?
24  A. Somewhere in Virginia.

**196**

1  Q. Who was the lawyer representing South
2  Central?
3  A. I don't know. He was from Jacksonville.
4  Q. When was that deposition given?
5  A. Actually I think it was after the 15th. I
6  was home because I had to do the deposition with a
7  knee brace.
8  Q. So you had to go back after your accident?
9  A. No. They came up to me.
10  Q. They came to Vermont?
11  A. Yes, sir.
12  Q. It was those lawyers from Vermont and
13 Jacksonville who came up to take your deposition?
14  A. No. Virginia.
15  Q. Virginia and Jacksonville. Do you have a
16 copy of your deposition?
17  A. No, sir.
18  Q. You didn't keep it?
19  A. No, sir.
20  Q. Now, what did you do with your boots after
21 your accident?
22  A. Stuck them in my locker.
23  Q. Did you take pictures of them of the stuff
24 that was on the bottom?

**197**

1  A. No.
2  Q. Did you do anything to preserve the
3  evidence that was on those boots before you cleaned
4  them off?
5  A. No, I cleaned them off out there. I
6  thought I was going to go back to work.
7  Q. You cleaned them that day?
8  A. I cleaned them right after I got off the
9  ground.
10  Q. What about the gloves?
11  A. Cleaned them off. I thought I was going
12 back to work.
13  Q. That night?
14  A. As soon as I got off the ground. I thought
15 I might be able to go back to work.
16  Q. Do you still have those boots?
17  A. Somewhere. I think it's in a storage
18 locker.
19  Q. Your storage locker?
20  A. Yes.
21  Q. Where is that?
22  A. In Vermont. I haven't been able to get up
23 there. I don't have the money to get there and get
24 that stuff.

Beacon Hill Court Reporting, Inc.
(617) 569-8050

Rickey A. Jones
November 1, 2005

(Pages 242 to 245)

### 242

1   Q. Railroad risk management?
2   A. Somebody had to call and set up the
3   appointment. And every time I tried to do it, I
4   couldn't get a hold of them, they wasn't there. It
5   was just a big runaround.
6   Q. Was anyone refusing to authorize your
7   medical treatment at that time, or was it just a
8   problem trying to get in touch with them?
9   A. Most of the time I talked to answering
10  machines so I don't know.
11  Q. But no one ever said to you -- you don't
12  have any evidence that you know of where anyone at
13  the railroad or railroad risk management or any
14  other entity that was working for the railroad said
15  we're not going to authorize the treatment?
16  A. No, sir, I don't.
17  Q. It was just a matter of your leaving
18  messages but no one is getting back to you?
19  A. Yes, sir.
20  Q. Finally that happened in January of 2004?
21  A. Somewhere around there.
22  Q. You had moved back down south in the
23  interim?
24  A. Excuse me?

### 243

1   Q. During that period of time, you moved back
2   down south?
3   A. Yes, sir.
4   Q. When did you do that?
5   A. I think it was September.
6   Q. Of '03?
7   A. Yes.
8   Q. Why did you move back south?
9   A. I couldn't afford to live in Vermont
10  anymore.
11  Q. Are you claiming that you couldn't live in
12  Vermont because you weren't working as a result of
13  this accident?
14  A. Yes, sir.
15  Q. That's part of your claim for damages in
16  this case; correct?
17  A. Yes, sir.
18  Q. Is there anything else that you say that
19  you used to be able to do but now you can't afford
20  to do as a result of this accident?
21  A. I can't get on the ground and play with my
22  kid anymore. I can't roughhouse with my daughter on
23  my knees. I can squat, but it hurts. I can do it
24  for short periods of time.

### 244

1   Q. I'm talking about things that you say that
2   you did -- because you're claiming this accident and
3   your inability to work as a railroad trainman has
4   decreased your income; correct?
5   A. Dramatically.
6   Q. Are you claiming that because of that
7   decrease -- and that decrease was caused by your
8   accident?
9   A. Yes.
10  Q. Are you claiming that because of that you
11  are no longer able to afford, to pay, financially
12  afford to do things that you used to do?
13  A. Correct.
14  Q. It's your claim in this case that part of
15  that -- that's part of your claim for damages;
16  correct?
17  A. Correct.
18  Q. What are those things that you used to be
19  able to do before August 15, 2002 that you claim in
20  this case you can no longer afford to do?
21  A. Go out on the weekends. Movies. I cannot
22  do that anymore.
23  Q. Can't afford to do it?
24  A. However you want to put it. It's

### 245

1   monetarily impossible. Between paying what bills I
2   do have and paying child support, there is very
3   little left over.
4   Q. Anything else?
5   A. That's about it.
6   Q. In that period of time August '03 to
7   January of '04, did you work anyplace else whether
8   it was under the table or not?
9   A. No.
10  Q. You didn't work at all?
11  A. No. I was in rehab.
12  Q. Well, you weren't seeking medical --
13  A. Which date?
14  Q. August '03 to January '04?
15  A. Oh, no. No, no. I was just busy trying to
16  get back down to Florida.
17  Q. How did you get back down there, by the
18  way?
19  A. I had to park my truck because I couldn't
20  drive it. It's in a storage shed up there.
21  Q. Is it still up there?
22  A. Yes, sir. I had to fly down.
23  Q. At some point in time you went to Georgia;
24  is that fair to say?

Beacon Hill Court Reporting, Inc.
(617) 569-8050

Rickey A. Jones
November 1, 2005

(Pages 246 to 249)

**246**

1   A. Yes.
2   Q. To visit your friend?
3   A. Yes, sir.
4   Q. Did you work down there at all?
5   A. No, sir.
6   Q. How long were you in Georgia?
7   A. Probably three weeks and change, something
8  like that.
9   Q. Did you do any recreational or physical
10 activities while you were down there?
11   A. I remember sitting in a deer blind. I
12 didn't go hunting. I sit there listening to the
13 birds.
14   Q. Did you get a license to hunt in Georgia?
15   A. No, sir.
16   Q. So you went along with your friend?
17   A. There was nobody around. He was up the
18 other way.
19   Q. You were sitting in the deer blind, and he
20 was out there?
21   A. Yeah. I didn't even have a gun at the
22 time. I run on back of four-wheelers, but that was
23 it. I wasn't driving them.
24   Q. Who was the friend you were with when you

**247**

1  sat in the deer hunt?
2   A. I wasn't with him. He was hunting.
3   Q. He was hunting. But did you go out there
4  with him?
5   A. Opposite end of the property.
6   Q. That was Ryan Cotton?
7   A. Yes, sir.
8   Q. The three weeks you spent in George, was
9  that around the time of his wedding?
10   A. No, sir.
11   Q. This was before or after he got married?
12   A. Way after. About almost a year, I guess.
13   Q. First time you got treatment in Florida was
14 with a Dr. Mikolajczak?
15   A. Mikolajczak.
16   Q. He was the first doctor you saw in Florida?
17   A. I think he was the only one.
18   Q. You treated with him for about 11 months;
19 right?
20   A. If you say so.
21   Q. The last time you saw him was November 11,
22 2004; correct?
23   A. Somewhere around there, yes.
24   Q. At that point in time, he pretty much had

**248**

1  said I can't do anything else with you; correct?
2   A. I have tried to get my left knee checked
3  out, and the company wouldn't authorize it.
4   Q. By that time, November of '04, he gave you
5  a maximum medical improvement?
6   A. Yes, sir.
7   Q. He put you on permanent light-duty status;
8  right?
9   A. I don't think I ever read the paper.
10   Q. Do you remember what restrictions he gave
11 you?
12   A. Not really. I think it was no heavy
13 lifting over something. No climbing up and down
14 stairs. I can't remember what it was.
15   Q. Do you remember that he also recommended
16 you for vocational retraining?
17   A. Yes, sir.
18   Q. Did you understand that meant trying to
19 learn a new skill so that you could obtain another
20 job?
21   A. Yes, sir.
22   Q. Have you done anything with respect to
23 vocational retraining?
24   A. How?

**249**

1   Q. Have you done anything?
2   A. I can't even afford to pay for a divorce.
3  I can't afford retraining.
4   Q. Have you gone to any state agency such as
5  Mass. Rehabilitation Commission or any commission
6  down in Florida whose job it is, whose purpose is it
7  to help people get back to work free of charge?
8   A. I didn't know it existed.
9   Q. Have you asked RailAmerica what vocational
10 retraining they have?
11   A. As far as they don't talk to me anymore.
12   Q. Have you asked them?
13   A. Once I got a lawyer, I wasn't allowed to
14 talk to them.
15   Q. Have you asked your lawyer to ask them?
16   A. No, sir.
17   Q. Have you asked RailAmerica if they have
18 jobs that you can do given your limitations?
19   A. At the point in time when I initially got
20 hurt I did. They said it was counting paper clips.
21   Q. Do you know that they recently advertised
22 for a dispatcher's position up there in St. Albans?
23   A. No.
24   Q. You don't know that?

Rickey A. Jones
November 1, 2005

(Pages 250 to 253)

**Page 250**

1  A. No.
2  Q. Did you ask the company about the potential
3  of coming back to work as a dispatcher?
4  A. I had briefly talked to them about it when
5  I first got hurt.
6  Q. Who did you talk to?
7  A. Tom Murphy I think it was.
8  Q. Who is he?
9  A. He's the -- I don't know the technical term
10  -- the big cheese over the dispatchers.
11  Q. What was his response to you?
12  A. He was thinking about giving me the job,
13  but I had to give up all my seniority. I was going
14  to be starting off on the bottom rung so I had no
15  protection.
16  Q. So he did offer you the dispatcher's job?
17  A. With no protection, yes.
18  Q. That would have been St. Albans?
19  A. Yes, sir.
20  Q. That would have been at the same rate of
21  pay as a trainman?
22  A. I don't know what the rate of pay is.
23  Q. You felt you could have done that
24  dispatcher's job?

**Page 251**

1  A. Physically, yes.
2  Q. You still feel that you can do it; correct?
3  A. Yes, sir.
4  Q. But the only reason you didn't take that
5  job is because you didn't want to give up your
6  seniority?
7  A. Yeah.
8  Q. When did he make that offer to you back in
9  2002?
10  A. That was after the first accident, well,
11  the accident August 15.
12  Q. Let's be clear when you say that. I think
13  I wrote it down earlier when you were describing the
14  July '03 incident, you said that wasn't an accident?
15  A. Correct.
16  Q. So you've essentially done nothing to look
17  into positions in the railroad that you might be
18  able to do given your limitation other than that
19  conversation you had with Tom Murphy?
20  A. After I got, after July 14, I really, to
21  the best of my knowledge, I wasn't supposed to be
22  going out in the yard or anything like that. I felt
23  like they didn't want me around.
24  Q. Are you currently looking to get another

**Page 252**

1  job other than the auto parts salesman job that you
2  now have?
3  A. I would like to make the same rate of pay
4  or more than what I did.
5  Q. Have you done anything to try to find a
6  better-paying job?
7  A. There is nothing where I live. It's either
8  work there or the mill.
9  Q. Have you done anything to try to find a
10  higher-paying job that you can do with your
11  limitations?
12  A. I've looked. There is nothing where I
13  live.
14  Q. What have you done to look for such a job?
15  A. Newspaper, computers, checking the
16  Internet. Stuff like that. But everything around
17  my area is, it's a farming community.
18  Q. Would you consider coming back to Vermont
19  if a dispatcher job was offered to you there?
20  A. Yes, sir.
21  Q. Would you consider moving to another area
22  of the country where a RailAmerica-owned railroad
23  was located to take a job that you could do given
24  your physical limitations?

**Page 253**

1  A. I would.
2  Q. You would?
3  A. I would sincerely think about it.
4  Q. Are there other jobs in the railroad other
5  than dispatcher job that you think you could do
6  given your physical limitations?
7  A. The only ones that I can really think of is
8  not in train services, dispatching and marketing
9  department and all that. It's office work.
10  Q. What about yardmaster?
11  A. That's a possibility. But on RailAmerica
12  you have to be certified as an engineer.
13  Q. Well, you can get on and off a locomotive,
14  can't you?
15  A. Yeah, I can do that.
16  Q. And you can do it enough to get certified;
17  correct?
18  A. Correct.
19  Q. Do you think you could work as an engineer?
20  A. Possibly.
21  Q. You think you could possibly do that with
22  your physical limitations?
23  A. Yes, sir.
24  Q. And assuming that you could do that, you

Rickey A. Jones
November 1, 2005

(Pages 254 to 257)

### Page 254

1  also could do the job of a yardmaster?
2     A. Possibly.
3     Q. Have you looked into getting a job with any
4  railroad, RailAmerica or otherwise, as a yardmaster
5  or an engineer?
6     A. I know the way they are. They do from
7  within. I would have to start as a conductor again.
8     Q. But have you made any attempts to go back
9  to work in either of those positions with any
10 railroad?
11    A. No.
12    Q. And if you went back to those positions,
13 that would be in train service; correct?
14    A. No. Yardmaster is management.
15    Q. Are you sure about that?
16    A. Yardmaster is management.
17    Q. Wouldn't you be able to keep your seniority
18 though if you went back --
19    A. Oh, yes. Yes, you would.
20    Q. You would be able to keep seniority if you
21 went back as an engineer; correct?
22    A. Yes, sir. When you are in management
23 though, it freezes.
24    Q. Until you go back to train service?

### Page 255

1     A. Correct.
2     Q. Last time you saw Mikolajczak was in
3  November of 2004. Have you seen any doctor since
4  then?
5     A. No, sir.
6     Q. Have you seen any medical professional,
7  physical therapist, acupuncturist?
8     A. Every day.
9     Q. Who do you see every day?
10    A. My mother.
11    Q. She does physical therapy for you?
12    A. Yes, sir.
13    Q. Is she a trained physical therapist?
14    A. Physical therapy tech.
15    Q. Does she keep records of her treatment with
16 you?
17    A. No.
18    Q. She's just doing it to help you out?
19    A. Yeah.
20    Q. Because she's your mom; right?
21    A. Yes, sir.
22    Q. No one has prescribed her to be your
23 physical therapist?
24    A. No, sir.

### Page 256

1     Q. You do that in the house?
2     A. Yes, sir.
3     Q. And last record we have indicates you were
4  on a drug call Bextra?
5     A. Did not take it.
6     Q. He gave it to you, but you never took it?
7     A. It was causing heart attacks and strokes.
8     Q. You read up on that?
9     A. Yes, sir.
10    Q. Dr. Mikolajczak wrote a report in February
11 of 2005. Have you seen that report?
12    A. I don't believe so.
13    Q. You didn't -- strike that.
14    A. I don't think I have copies of any reports.
15    Q. Has any doctor told you that you are a
16 candidate for surgery in the future?
17    A. Both of them. Beattie and Mikolajczak.
18    Q.. What have they told you about that?
19    A. They said it could be -- what do you call
20 it -- the knee replacement, prosthetic knee. But
21 I'm too young now.
22    Q. Is that something you plan to get in the
23 future?
24    A. Honestly hope it doesn't get that bad.

### Page 257

1     Q. You know that Dr. Mikolajczak has diagnosed
2  you with having progressive osteoarthritis; correct?
3     A. I think I might have heard that.
4     Q. What's your understanding of what he's told
5  you that you currently have?
6     A. He talked a lot of doctor jargon. I mean,
7  I knew that what he did in the second surgery I
8  think he said it was a lag in the ACL. He tightened
9  it up and removed more meniscus. As far as anything
10 else goes, I don't know what he's talking about.
11    Q. That was in February '04?
12    A. Yes, sir.
13    Q. The three things he did was, like you said,
14 he tightened up the ACL repair; correct?
15    A. Yes, sir.
16    Q. He also found that you were wearing a brace
17 that Dr. Beattie had prescribed?
18    A. Yes, sir.
19    Q. He said it was all worn out?
20    A. Yes, sir.
21    Q. He replaced it?
22    A. Yes, sir.
23    Q. Where had it worn out if you had been
24 leading a sedentary lifestyle?

Rickey A. Jones
November 1, 2005

(Pages 262 to 265)

**262**

1  Q. So part of the bone that you are having
2  this problem is the same part of the leg that you
3  had a problem with when you were in the military;
4  correct?
5  A. That one I don't know.
6  Q. You went through physical therapy for three
7  months after this surgery in February '04; right?
8  A. Somewhere around there. I don't know if it
9  was three months.
10  Q. You were discharged after some
11  improvements; right?
12  A. Some, yes.
13  Q. Then they tried hyalogen injections again
14  last summer; right?
15  A. Yes. Dr. Mikolajczak said it might work
16  and it might not.
17  Q. They didn't, did they?
18  A. No, sir.
19  Q. Do you currently have any plans to go see
20  any doctors or medical professionals?
21  A. I don't have any plans. I would like to,
22  but I have no money.
23  Q. Has the railroad paid for all of your
24  medication treatment to date?

**263**

1  A. That I know of.
2  Q. Have they refused to pay any medical
3  treatment?
4  A. They wouldn't allow them to check my left
5  knee.
6  Q. Other than that, has there been any medical
7  treatment they refused to pay?
8  A. Not that I know of.
9  Q. Following the August 15, 2002 accident, you
10  were paid your wages until you returned back to
11  work; right?
12  A. Yes, sir.
13  Q. That was your full wage?
14  A. What do you mean by full?
15  Q. It was your full wage that they paid during
16  that period of time; right?
17  A. The average I made, no. It was less.
18  Q. Do you recall that during those months,
19  August, September, October, November, December,
20  January, February, and into March, those eight
21  months that you received 18,600?
22  A. Yes. It was something like that.
23  Q. Did you have to pay taxes on that?
24  A. Yes, sir.

**264**

1  Q. That was about what you would have made for
2  a 40-hour week during that time period; correct?
3  A. Roughly. But I never worked 40 hours
4  there.
5  Q. After then, you went back to work so you
6  made your wage during that period of time from March
7  to July of 2003; right?
8  A. Yes. And it went up. I think I was making
9  15 something.
10  Q. Then when you went out again in July, were
11  you paid wage continuation for a period after that?
12  A. I don't know how long though.
13  Q. My records would indicate that you were
14  paid your full wages until January 1 of '04; is that
15  fair to say?
16  A. Somewhere around there.
17  Q. Then after that, you were put on Family
18  Medical Leave?
19  A. I got a letter. They said they were
20  terminating my pay and my insurance.
21  Q. You get a letter from whom?
22  A. RailAmerica.
23  Q. Were you at any time put on long-term
24  disability?

**265**

1  A. Not to the best of my knowledge.
2  Q. Were you ever put on Family Medical Leave
3  Act status?
4  A. I don't know with that is.
5  Q. Are you saying that once the wage
6  continuation was discontinued in January of '04, you
7  did not receive any more wages from the railroad?
8  A. Correct.
9  Q. Did you apply for any insurance benefits?
10  A. Apply where? I mean, I didn't get any
11  insurance, no. I had to go to the railroad board to
12  get -- I don't know what you call it. It was -- I
13  don't know what it was. It was some kind of
14  disability. It was short term.
15  Q. Are you currently collecting any benefits
16  from the Railroad Retirement Board?
17  A. No, sir.
18  Q. Did you at any time collect benefits from
19  the Railroad Retirement Board?
20  A. Whatever that short-term thing is.
21  Q. From when to when did you receive those
22  benefits?
23  A. I don't even know. It was maybe March or
24  April up until --

Rickey A. Jones
November 1, 2005

(Pages 266 to 269)

**266**

1  MR. MYERS: Just note my objection. You
2  can answer the question. Just note my objection for
3  the record.
4      A. It was March or April up until like
5  November.
6      Q. Of '04?
7      A. Yeah.
8      Q. March of '04 to November of '04?
9      A. Something like that.
10     Q. Basically the period of time that you
11 treated with Dr. Mikolajczak?
12     A. Yes, sir.
13     Q. What did you receive per month from the
14 Railroad Retirement Board?
15         MR. MYERS: I have a continuing
16 objection to RRB questioning.
17     A. It was five hundred change and every two
18 weeks.
19     Q. It was about half your wage?
20     A. Yes, sir.
21     Q. You had to continue to submit reports from
22 your doctor saying you were disabled?
23     A. Yes, sir.
24     Q. Why did those payments stop?

**267**

1      A. I got maximum medical whatever that is.
2      Q. Maximum medical improvement?
3      A. Yes, sir. I didn't have a doctor anymore.
4      Q. Are you currently in the process of
5  requesting the RRB for any more benefits?
6      A. I don't know how. I don't have a doctor.
7      Q. Did you get some kind of notice from the
8  RRB when the payments stopped?
9      A. No, sir.
10     Q. Do you know what the total amount of your
11 RRB lien is?
12     A. What do you mean?
13     Q. Do you understand that the Railroad
14 Retirement Board is entitled to get paid back out of
15 any settlement in this case monies they have paid to
16 you?
17     A. I knew you had to pay it back if you go
18 back to work. But I didn't know about a lien.
19     Q. Do you know how much total they paid you?
20     A. No, sir.
21     Q. Have you received any benefits from any
22 other source?
23     A. No, sir.
24         MR. MYERS: Do you know a number for the

**268**

1  wage continuation?
2          MR. FLYNN: I got 18-6.
3          MR. MYERS: Wouldn't it be more?
4          MR. FLYNN: I got 18-6 the first period.
5  I don't have it calculated for the second period.
6  Although it looks like it would be probably half of
7  that.
8      Q. Do you recall how much you received in wage
9  continuation following the July 14 --
10     A. No. The figure was, no, sir.
11     Q. Have you retained an expert witness in this
12 case?
13     A. Excuse me?
14     Q. Have you retained an expert witness in this
15 case?
16     A. I don't know the term.
17     Q. Okay. Have you given an interview to
18 anybody other than your attorneys about what
19 happened to you in this case?
20     A. Not that I remember.
21     Q. What do you claim that the railroad did
22 wrong or negligent with respect to the August 15,
23 2002 incident?
24     A. Where do I start?

**269**

1      Q. Tell me in your own words what you claim
2  they did wrong.
3      A. They allowed me and everyone else to work
4  in the conditions we worked in in the yard. The
5  slip, trip, and fall hazards that were constantly
6  talked about to management but never done anything
7  about. And getting the stuff on my boot and getting
8  on the car without knowing it was on my boot, I
9  mean, there I was working by myself. I just come
10 from a three-man crew. They wanted to save money so
11 we lost a guy. Instead of having three men, it was
12 two men. If it was three men, I would have never
13 been on the car.
14     Q. The brakeman would have been riding it;
15 right?
16     A. No.
17     Q. How would it have worked?
18     A. The way we worked it up there is one of you
19 makes the cuts, the other one waits at the switch,
20 and you never ride the train. You are always in
21 position.
22     Q. Do you know that your union bargained away
23 that third position?
24     A. Yes, I do.