UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICKEY A. JONES,<br>Plaintiff,<br><br>v.<br><br>NEW ENGLAND CENTRAL RAILROAD,<br>INC.,<br>Defendant. | Civil Action No.: 04-11772-MAP |

## NEW ENGLAND CENTRAL RAILROAD, INC.'S MOTION IN LIMINE TO EXCLUDE ANY EVIDENCE ABOUT THE PRESENCE OF SLURRY, OIL OR GREASE

The New England Central Railroad, Inc. ("NECR") moves in limine to exclude the plaintiff, Rickey A. Jones, from testifying that slurry, oil or grease were present on either himself or the railroad tank car from which he fell. As grounds therefore, the NECR states that the plaintiff has affirmatively admitted that although these conditions were generally present in the NECR's rail yard, these conditions were not present on either the soles of his boots or the "stirrup" from which he fell at the time he fell. Thus, these substances cannot be said to have caused or contributed to cause the plaintiff's accident and are therefore, not relevant.

### I.    FACTUAL BACKGROUND:

The defendant refers to and hereby specifically incorporates by this reference the "Factual Background" section of its *Motion in Limine to Exclude Plaintiff's "Design Defect" Theory*.

### II.    DISCUSSION OF LAW:

### A.    The Plaintiff's Expected Testimony About Foreign Substances Is Not Relevant:

Relevant evidence is any evidence having any tendency to make the existence of any fact that is of consequence more probable or less probable than it would be without the evidence. Fed.R.Evid. 401.   Further, although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.  Fed.R.Evid. 403.

### 1.      Slurry:

It is currently the plaintiff's contention that the tank car from which he fell was covered in a substance known as "slurry."  However, he has admitted in his deposition that there was no slurry on the stirrup from which fell. *See* the transcript of the plaintiff's deposition, a copy of the relevant portions of which is attached as Exh. "A," at p. 167.   Moreover, the plaintiff at the time of his accident  did not notice any slurry on the car – he completed a *Personal Injury Report* shortly after his accident occurred, in which he failed to identify the presence of any foreign substance and stated that the tank car had no known defect. *See Plaintiff's Personal Injury Report,* a copy of which is attached as Exhibit "B."   Nathanial Cobb, the plaintiff's co-worker who came upon him shortly after he fell from the tank car, also filled out a report in which he failed to mention the presence of any substances and noted no defects. *See Personal Injury Report of Nathaniel Cobb*, a copy of which is attached as Exhibit "C."  The plaintiff also failed to mention the presence of slurry to an investigator who took his statement on August 21, 2002. Exh. A  at p. 185-189.  Perhaps most importantly, the plaintiff has also admitted that photographs taken by an NECR car inspector the day following the accident clearly show that there was no slurry on the stirrup or sill from which the plaintiff allegedly slipped.  Exh. A at p. 168-170; *see also* photographs taken by Thomas Tozzer, attached as Exhibit "D."

2

Since the plaintiff has repeatedly admitted that he did not observe slurry on the pieces of equipment which he was riding and dismounting, any testimony about slurry on other parts of the tank car, or on other tank cars the plaintiff has observed, is simply not relevant and must be excluded.

### 2.    Oil And Grease:

The plaintiff also claims he was caused to step in oil and grease that he claims was present throughout the yard, the implication being that these substances were tracked onto his boots and ultimately contributed to his "slipping." At the time of his accident, the plaintiff was contacting the tank car's equipment with the arch of the sole of his boot. When he inspected his boot after the alleged incident, he found these substances only on the top of the toe of his boot. *See* Exh. A at p. 183-84. The plaintiff admitted he does not know if any oil or grease was present on the soles of his boots. Id. at p. 184-185. He later cleaned his boots and put them in his locker, which he later cleaned out. Neither these boots nor the articles which were used to clean them have ever been produced. Inspections of the car failed to find any oil or grease on its dismounting equipment. Since the plaintiff cannot produce any competent evidence that oil or grease were actually present at the time and place of this accident, these substances are not relevant. Thus, any evidence about the general presence of these substances throughout the yard, or more specifically, present on the plaintiff's boots, must be excluded.

Even if the court finds that this evidence is somehow relevant, the evidence still must be excluded, as it will be unfairly prejudicial to the defendant and may cause the jury to confuse the condition of the yard and/or other rail cars with how the plaintiff's foot "slipped" from the stirrup or sill or and/or mislead the jury. *See* Carter v. Hewitt, 716 F.2d 961, 972 (3d Cir. 1980).

3

## III.    <u>CONCLUSION:</u>

WHEREFORE, for all of the above-stated reasons, the defendant respectfully requests

that its motion be allowed and that this Honorable Court prohibit the plaintiff from introducing

any and all evidence on, or theory about, the presence of slurry, oil or grease.

Respectfully submitted,
The defendant,
NEW ENGLAND CENTRAL RAILROAD, INC.,
by its attorneys,

/s/ Michael B. Flynn
Michael B. Flynn,   BBO #559023
Valerie A. Murphy, BBO #661460
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169
(617) 773-5500

Dated:  July 21, 2006
G:\F & A\CASE FILES\RAILAMERICA\New England Central\JONES, RICKEY A\pleadings\Motion in Limine - Exclude evid of slurry or oil.doc

4

Exhibit "A"

Rickey A. Jones
November 1, 2005

1

Volume I, Pages 1-319

Exhibits 1-11R

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

RICKEY A. JONES                          *

                Plaintiff                *

vs.                                      * No. 04-11772-MAP

                                         *

NEW ENGLAND CENTRAL RAILROAD, INC.*

                Defendant                *

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

        DEPOSITION OF:  RICKEY A. JONES

           FLYNN & ASSOCIATES, P.C.

        400 Crown Colony Drive, Suite 200

              Quincy, Massachusetts

     November 1, 2005   9:30 a.m.-3:50 p.m.


-----REPORTED BY: CHRISTINE SILVA-ADERMANN/RPR-----

           BEACON HILL REPORTING

            44 Bayswater Street

          Boston, Massachusetts

     617.569.8050    Fax 617.569.8150

Rickey A. Jones
November 1, 2005

166

1  answer, then I have to speak up. I don't think --
2  that's not fair of you to even interrupt the answer.
3  I don't know whether it was responsive or not.
4      MR. FLYNN: Mark this part of my
5  deposition. This is obstructionist. It's coaching
6  the witness. To the extent the question -- I'll
7  withdraw the last question, and I'll ask this.
8      MR. MYER: Objection.
9      Q. When Mr. Ogden asked you about this when he
10 took your statement, he asked you what caused you to
11 fall. Do you remember him asking you that?
12     A. No, sir, I don't.
13     Q. What do you say was on the tank car that
14 caused you to fall?
15     A. What did I say?
16     Q. No, I'm asking you right now. What do you
17 say?
18     A. On the tank car itself it was the slurry.
19 From unloading and loading the car, it gets
20 everywhere.
21     Q. So that's this tank car was something that
22 carried talcum powder?
23     A. It's basically talcum powder. It's crushed
24 limestone with water. And when it comes out of the

167

1  car and dries, it turns to talcum powder basically.
2      Q. You are able to see that; correct?
3      A. Somewhat.
4      Q. It's white; right?
5      A. So is the car.
6      Q. All right. Not the stirrup though?
7      A. No. The stirrup is black.
8      Q. So you would have been able to see it if it
9  was on the stirrup; right?
10     A. Maybe.
11     Q. And you certainly didn't see anything there
12 that night, did you?
13     A. Yeah. I mean, it's all over the car.
14     Q. Did you specifically see it on the stirrup
15 from which your left foot slipped?
16     A. I couldn't see the stirrup. The stirrup is
17 underneath the car.
18     Q. Before you got on it, did see whether or
19 not there was slurry on it?
20     A. I don't remember.
21     Q. You don't remember one way or the other?
22     A. No, sir.
23     Q. Do you remember that you told Mr. Ogden
24 when he took your statement that it was simply

168

1  because you had bad footing that your foot slipped?
2      A. Yes, sir.
3      Q. You didn't tell him anything about slurry
4  on the car, did you?
5      A. Bad footing in NECR is a whole label of
6  everything.
7      Q. When you said bad footing, you meant all of
8  this other stuff?
9      A. Yes. Even on the dispatcher's bulletins it
10 will tell you to watch out for bad footing whether
11 it's ice, grease, water, snow. Bad footing is
12 basically an umbrella.
13     Q. Let me show you a photograph which was
14 taken the day after the accident.
15     MR. MYERS: Have we ever been supplied
16 color photographs?
17     MR. FLYNN: I don't know.
18     MR. MYERS: I have no color photographs
19 that have been supplied in discovery. I have
20 Xeroxed copies of photographs.
21     MR. FLYNN: I have Xeroxed copies of the
22 ones you took too. No colors.
23     MR. MYERS: I'm not questioning the
24 witness today from Xeroxed photographs. I'd like to

169

1  see the photographs.
2      MR. FLYNN: I'll have it marked as the
3  next exhibit.
4      (Marked, Exhibit 5, Photograph)
5      A. May I use the rest room, please.
6      MR. FLYNN: Sure. Anytime you need a
7  break, just ask.
8      MR. MYERS: For the purpose of the
9  record, we would like copies of the color
10 photographs as well as copies of the audio
11 statements of the tapes.
12     (Break taken)
13     Q. That photograph, Exhibit 5, depicts --
14 first of all, does it depict the tank car that was
15 involved in the case?
16     A. I don't remember the number off my head.
17 I've heard you mention it, but that's the number.
18     Q. That tank car has the same number as the
19 one we've been referring to?
20     A. Yes, sir.
21     Q. And as far as you recall, that was the
22 number of the tank car involved in your accident;
23 right?
24     A. Yes, sir.

Rickey A. Jones
November 1, 2005

(Pages 170 to 173)

---

**170**

1  Q. Does that appear to be the same tank car in
2  that photograph?
3  A. Yes, sir. The numbers match.
4  Q. Regardless of the number, does it look like
5  the tank car involved in your accident?
6  A. They all look identical.
7  Q. Does that appear to be the corner on which
8  you were riding or that you stepped off from the
9  time of your accident?
10  A. I honestly don't remember whether it was
11  the A end or B end.
12  Q. Do you see the stirrup there?
13  A. Barely. The picture is dark.
14  Q. Do you see any slurry on the picture?
15  A. No. Not from this distance.
16  Q. Is there any slurry on the stirrup?
17  A. No, sir.
18  Q. Is there any slurry on any other part of
19  the car?
20  A. Not that I can see.
21  Q. Just so we're clear, using this picture
22  where it says two-inch HF comp shoes, can you read
23  that?
24  A. Yes, sir. I know what that is.

---

**171**

1  Q. It's the stenciling which is on what you
2  call the angle iron; correct?
3  A. Yes, sir.
4  Q. You were standing, when you had your right
5  foot in place, you were standing to the left of
6  where it says two-inch comp shoes, your right foot
7  was on top of the angle iron to the left of that
8  stenciling; right?
9  A. Right up against the bar here.
10  Q. And the bar is the bar which is half black
11  and about half yellow which goes up in a vertical
12  direction?
13  A. It's white.
14  Q. So it's white and black in a vertical
15  direction and then it curves to a horizontal along
16  the back of the car?
17  A. Yes, sir.
18  Q. When you were standing there, you had your
19  hands about where the color changes?
20  A. No. On the white part.
21  Q. Up where it angles over?
22  A. Yes, sir.
23  Q. Why don't we just draw an X, if you could
24  draw an X where you indicated your hands were on the

---

**172**

1  vertical railing?
2  A. (Witness complying)
3  Q. See if it comes out, can you draw an X
4  where your right foot was on the angle iron?
5  A. (Witness complying)
6  Q. Would you draw an arrow out from that X to
7  a clear part of the picture?
8  A. (Witness complying)
9  Q. And at the end of that line, would you just
10  put right foot or, yeah, just write in right foot so
11  we know what you are talking about there.
12  A. (Witness complying)
13  Q. Then the stirrup, would you just circle the
14  stirrup, sir, with that red pen?
15  A. (Witness complying)
16  Q. I know it's hard to make out. Would you
17  also put an X where your left foot was just before
18  it slipped?
19  A. Just before it slipped.
20  Q. Mm-mm. Right in the middle of that
21  stirrup?
22  A. Yes, sir.
23  Q. Would you draw a line out from that X to a
24  clear part of the paper and put left foot?

---

**173**

1  A. (Witness complying)
2  Q. Now, would you just initial on the bottom
3  left-hand corner and date that Exhibit 5, please.
4  A. (Witness complying)
5  Q. You filled out a report after this
6  incident; correct?
7  A. I don't know if I did that or not.
8  MR. FLYNN: Okay. Let me have marked as
9  Exhibit 6 the document marked personal injury
10  report.
11  (Marked, Exhibit 6, Personal Injury
12  Report)
13  Q. Sir, going to show you Exhibit 6 which is
14  the personal injury report in this case. Is that
15  your signature on the bottom left-hand corner?
16  A. Yes, sir.
17  Q. Did you write the word "conductor" to the
18  right of your signature?
19  A. Yes, sir.
20  Q. Did you date it August 15, '02?
21  A. I guess I did.
22  Q. Is it your handwriting above that in the
23  blanks?
24  A. I really don't know.

44

Rickey A. Jones
November 1, 2005

(Pages 182 to 185)

---

**182**

1 yard, you cannot stop picking up motor oil. My
2 gloves had white powder on them. When Nathaniel
3 Cobb helped me up, I cleaned myself off.
4    Q. Your boots had evidence of these conditions
5 on them?
6    A. Yes, sir.
7    Q. What specifically was on them?
8    A. Rotten grain and I know motor oil was
9 because this was on the tip of my boot.
10    Q. You had rotten grain on the bottom of your
11 boots?
12    A. Yes, sir.
13    Q. Anything else?
14    A. Not on my boots, no.
15    Q. So it's just rotten grain?
16    A. Yes.
17    Q. So there was motor oil on the tip of your
18 boot?
19    A. Yes, sir. That's what I can remember.
20    Q. Not on the sole?
21    A. That's what I can remember. On the tip of
22 the sole underneath at the tip of the boot.
23    Q. What part of your sole actually slipped off
24 the stirrup?

---

**183**

1    A. I had my foot on the stirrup so about arch
2 deep it started sliding off.
3    Q. You didn't have your heel of your boot
4 wedged in?
5    A. You can't.
6    Q. Why not?
7    A. Because of the angle they put the stirrup.
8    Q. Okay.
9    A. It put your body mechanics at such an
10 awkward position you can't get your foot in there
11 correctly.
12    Q. So it was somewhere around the arch of your
13 foot that you were actually contacting the stirrup?
14    A. Yes, sir.
15    Q. So kind of the middle of the sole of your
16 boot; is that what you're saying?
17    A. Yes, sir. Towards the heel.
18    Q. Towards the heel. But the middle?
19    A. Yes, sir.
20    Q. Where was the motor oil?
21    A. That was on the front. Can I show you?
22    Q. Yes.
23    A. It was in this area from throwing the
24 switch.

---

**184**

1    Q. So that part wasn't -- what you've
2 basically shown me is --
3    A. Grain was on both of my boots.
4    Q. Hold on. But the motor oil was underneath
5 the toe portion of the sole of your left foot;
6 right?
7    A. Yes, sir.
8    Q. Of your left foot, right?
9       MR. MYERS: You lost me on that one.
10 You kept changing.
11    Q. The boot you've been talking about is your
12 left boot; right?
13    A. Yes, sir.
14    Q. Correct?
15    A. Correct.
16    Q. Are you saying it was the grain on your
17 boot that caused you to slip off the stirrup?
18    A. I'm saying it could have been a compilation
19 of both.
20    Q. The only thing you saw was grain in the
21 area of the sole of your boot that actually came in
22 contact with the stirrup; is that fair to say?
23    A. Yes.
24    Q. The motor oil was there, but that wasn't on

---

**185**

1 the part of your sole that actually slipped of the
2 stirrup?
3    A. I don't know. I flopped around in the dirt
4 trying to get up.
5    Q. Did you say anything about rotten grain or
6 motor oil in your personal injury report, Exhibit 6?
7    A. I said my foot slipped out.
8    Q. Did you say anything about rotten grain or
9 motor oil?
10    A. It didn't ask me why.
11    Q. But you are telling me here today about all
12 these conditions that you were concerned about;
13 right?
14    A. Yes, sir.
15    Q. And you made reports about them before,
16 even when you weren't hurt; right?
17    A. Yes, sir.
18    Q. But here you are hurt filling out a
19 personal injury report on August 15, 2002. Now you
20 are saying it was caused by these awful conditions,
21 but you never said anything in your report about it,
22 did you?
23    A. I guess not.
24    Q. You never said anything in the statement

---

**Beacon Hill Court Reporting, Inc.**
**(617) 569-8050**

Rickey A. Jones
November 1, 2005

(Pages 186 to 189)

|  | 186 |
|---|---|
| 1 | that you gave to Mr. Ogden, did you? |
| 2 | A. I don't remember that. |
| 3 | Q. I'm going to show you your statement to Mr. |
| 4 | Ogden. I'm going to show you a transcript of it. |
| 5 | I'm going to ask you to review it, and then once |
| 6 | you've had an opportunity to -- we'll take a break |
| 7 | while you are doing that. Let me know when you |
| 8 | completed it; okay? |
| 9 | A. Okay. |
| 10 | MR. FLYNN: It's going to take you a |
| 11 | while. It's a few pages. |
| 12 | MR. MYERS: I can make a phone call? |
| 13 | MR. FLYNN: Sure. |
| 14 | (Break taken) |
| 15 | MR. FLYNN: Let's have the transcript of |
| 16 | the statement marked as Exhibit 7. |
| 17 | (Marked, Exhibit 7, Transcript of |
| 18 | Statement) |
| 19 | Q. Sir, you've now had an opportunity, about a |
| 20 | half-hour, to read a statement you gave to Mr. Ogden |
| 21 | August 21, 2002; right? |
| 22 | A. Yes. |
| 23 | Q. That statement has been marked as Exhibit |
| 24 | 7? |

|  | 187 |
|---|---|
| 1 | A. Yes, sir. |
| 2 | Q. Having read it, does it refresh your memory |
| 3 | that you gave that statement back in August 2002? |
| 4 | A. No. |
| 5 | Q. You agree with me having read it, you |
| 6 | didn't say anything in this statement about any of |
| 7 | those conditions which you've described today at the |
| 8 | deposition, did you? |
| 9 | A. Well, I described the slipping. |
| 10 | Q. All you said in the statement was that you |
| 11 | slipped; correct? |
| 12 | A. Yes. |
| 13 | Q. You didn't say anything about rotten grain, |
| 14 | did you? |
| 15 | A. No, I didn't. |
| 16 | Q. You didn't say anything about motor oil |
| 17 | being used on switches, did you? |
| 18 | A. I didn't have to. |
| 19 | Q. Just yes or no. Did you say anything about |
| 20 | motor oil being used on switches? |
| 21 | A. No, sir. |
| 22 | Q. Did you say anything about motor oil on |
| 23 | your boots? |
| 24 | A. I don't remember reading about it. |

|  | 188 |
|---|---|
| 1 | Q. Did you say anything about rotten grain on |
| 2 | your boots? |
| 3 | A. No, sir. |
| 4 | Q. Did you say anything about grease from |
| 5 | locomotives? |
| 6 | A. No, sir. |
| 7 | Q. Did you say anything about grease from |
| 8 | cars? |
| 9 | A. No, sir. |
| 10 | Q. Did you say anything about slurry? |
| 11 | A. No, sir. |
| 12 | Q. Did you say anything about any of these |
| 13 | conditions being all over the yard as you described |
| 14 | here at your deposition? |
| 15 | A. No, sir. |
| 16 | Q. This statement was taken six days after |
| 17 | your accident; correct? |
| 18 | A. Yes, sir. |
| 19 | Q. This statement was taken before you sought |
| 20 | the services of counsel; correct? In other words, |
| 21 | before you hired a lawyer; right? |
| 22 | A. Yes, sir. |
| 23 | Q. When did you hire a lawyer, by the way? |
| 24 | A. I don't really remember the date. |

|  | 189 |
|---|---|
| 1 | Q. Earlier in response to one of my questions |
| 2 | about the volleyball incident, you said, geez, it |
| 3 | was four or five years ago, it was hard to remember; |
| 4 | right? |
| 5 | A. I had a couple of drinks that day so it |
| 6 | made it a little more difficult. |
| 7 | Q. Were you drunk at the time of the |
| 8 | volleyball incident? |
| 9 | A. No. |
| 10 | Q. You had a couple of drinks? |
| 11 | A. Yes. |
| 12 | Q. So that made it even more difficult to |
| 13 | remember? |
| 14 | A. Yes. |
| 15 | Q. Was there anything about this statement |
| 16 | which made it difficult to remember? |
| 17 | A. Yes, sir. |
| 18 | Q. What was that? |
| 19 | A. I had been on painkillers. I told him that |
| 20 | before he started recording. |
| 21 | Q. What painkillers were you taking? |
| 22 | A. Percocet, I think it was. |
| 23 | Q. Did that affect your ability to remember |
| 24 | what had happened six days earlier? |

48

Exhibit "B"

# PERSONAL INJURY REPORT

PI 002

This form must be completed by each employee injured on duty and by all witnesses as well as those who have pertinent information concerning the accident. When an accident is caused by the breaking of machinery, tools or appliances, broken parts must be so marked as to be readily identified and returned for safe keeping to be produced thereafter if needed.

INSTRUCTIONS: The injured party and all witnesses will be complete this form, each using a separate form.

Injured employee to complete lines 1 through 18 and lines 20 and 21. Witnesses and others having pertinent information complete line 1 and lines 6 through 21.

1. Name of Injured  *RICKEY A JONES*   Occupation  *TRAINMAN*
2. (Married) or Single  _____   No. of dependents  *1*
3. Home Address  *23 DEPOT ST*   Telephone No.  *(802) 868-7051*
4. Length of Service  *SWANTON VT   16 MON*   SSN#  *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*
5. Assigned Tour of Duty  *PK SWITCHER*   Rest Days  *SUN MON*
6. Date of Accident  *081502*   Time  *1925*  AM/PM
7. Place of Accident  *ST ALBANS, VT YARD*   Weather  *CLEAR 86°*
8. Nature of Injuries  *KNEE*
9. Doctor  _____   Hospital  _____
10. Describe how injury occurred.  *SLIPPED FROM RUNG OF CAR*
11. What was cause of accident?  *SLIP*
12. Was accident caused by any defects in tools or equipment?  *UNKNOWN*
13. If answer is "yes" describe.  _____

14. Initial and number of cars involved in accident  *SHPX 201016*

15. Engine No.  *RDMX 9431* / Train No.  *DKSW*   Kind of Train  *YARD SWITCHER*
No. of cars  *3*  Speed  *0*   MPH Direction  *STOPPED*
16. Engineer  *N.Y. COBB*   Conductor/Foreman  *R.A. JONES*
Brakeman/Switchman  _____   Fireman  _____
17. Was the work being done in the usual and customary manner?  *YES*
18. Name of Company Officer notified of accident  *W.L. MAGEE*
19. Did you see accident?  *NO*
20. Name, occupation and address of every person who witnessed the accident or can give any information regarding it.  *NATHANIEL Y COBB   ENGINEER*
21.  *13 KINGMAN ST #2*
*ST ALBANS, VT 05478*
*(802) 527-0010*

Signature *Nathaniel Y Cobb*   Occupation *Engineman*   Date *081502*

10/1/99

Exhibit "C"

1. Railroad :  'ECR                                    2. Case/Incident Numb: _____    PI 001

(*If Hazmat Involved)         yes ☐    no ☐   FAX 610-458-7448
Environmental Claims Administrators, Inc. (24 hour no.)      Bill Hoffman      (800) 432-2481      ATTN: Bill Hoffman
aployees involved:      1) R.A. Jones          2) NY Cobb          3) _____
                            (injured employee)

Years experience at this work:  1) 1 yr. - 6 mos.      2) 4 years      3) _____

Reasonable cause testing:   1) yes ☒  no ☐      2) yes ☐  no ☒      3) yes ☐  no ☐

## INJURED EMPLOYEE INFORMATION

3. Last Name, First Name, Middle Initial
Jones  Rickey  A.

4. Home Street Address (Include Apt. No.)          5. City          6. State   7. ZIP
23 Depot Street                        Swanton         VT      05488

8. Home Telephone (include area code)   9. Date of Birth   10. Sex (M/F)   11. Social Security Number
(802) 868-2057            11-07-74          M        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

12. Name of Facility Where Employee Normally Reports
St. Albans Engine House

13. Facility Street Address              14. City     15. State   16. ZIP
Lower Hoyt Street                St. Albans    VT      05478

17. Date Hired          18. Job Title             19. Department Assigned
4-28-2002          Conductor             Transportation

## ACCIDENT/INCIDENT/EXPOSURE DESCRIPTION

20. Specific Injury Site                      21. Weather Conditions/Temperature
Track 108 Switch S.E. Itely Yard                Clear  86°

22. City          23. County         24. State   25. ZIP
St. Albans       Franklin           VT      05478

o. Is this on your premises?  Yes        27. Date of Occurrence   28. Time Shift Began   29. Time of Occurrence
30. Was Employee On Duty?  Yes            8-15-2002            1600            1925

31. Date that Employee Notified   8-15-2002        32. Time that Employee Notified   19:30
Company Personnel of Condition                    Company Personnel of Condition

33. Person Notified   Dispatcher JDB / W.L. Magee AGM

Has this employee been injured previously within duties for this railroad?   no

If yes, when, and what type of injury?   n.a.

34. Describe the General Activity this person was engaged in prior to injury/illness.

    Switching operations.

35. Describe all factors associated with this case that are pertinent to an understanding of how it occurred. Include a discussion of the sequence of events leading up to it, and the tools, machinery, processes, material, environmental conditions, etc, involved.

Pulling three empties out of S.E. of track 8 with intent of moving cars to track 9. Mr. Jones dismounted car @ 108 switch. Employee states that the car was not moving when he dismounted.

5. Describe in detail the injury/condition that this person sustained. Include a discussion of the body parts affected. If this is a recurrence, list date of last occurrence.   Right knee soft tissue sprain. This is a recurrence of an off duty injury.

**Railroad Employee Injury And/Or Illness Rec___**

RailTex Initial Incident Notification Form                                Form PI 001

Dismounting  Car #  SHPX  201016

7. Identify all persons and organizations used to evaluate and/or treat the condition. (Include facility, provider, and address)

North Western Medical Center / ER

8. Describe all procedures, medications, therapy, etc., used/recommended for the treatment of condition.

rest,  no prolonged standing, walking, bending for 2 week,

9. Answer yes or no to any of the following consequences resulting from this injury/condition:

| | |
|---|---|
| yes | Restriction of work. Total days of restricted activity:    4    as of: 8/15/02 (date) |
| | Occupational illness. Date of initial diagnosis: |
| | Instructions to obtain prescription medication, or receipt of prescription medication |
| yes | Missed a day of work or next shift. Actual days absent from work:  1/2  as of: 8/15 (date) |
| yes / ER | Medical Treatment. (This includes any medical care or treatment beyond "first aid" that is given, or should have been given, regardless of who provided the treatment. "First Aid" treatment is limited to very simple procedures, e.g., application of a band-aid on minor scratches, cuts, abrasions, etc.) |
| | Transfer to another job or termination of employment |
| | Hospitalization for treatment as an inpatient. |
| | Multiple treatments or therapy sessions. |
| | Loss of conciousness. |
| | Death. Date of: |

If any of the above consequences occurred, the injury/condition is almost always reportable to FRA on Form FRA F 6180.55a.
you believe this case does not meet the reporting criteria, you must give a brief explanation below of the basis for this decision.
as the case reported?       Yes

. Has this employee been given an opportunity to review his or her file?      Yes

. Preparer's Name          _J. K. Magee_

. Telephone Number        (802) 522-3416       43. Preparer's Title, _A G M_
                                              45. Date   8/15/2002

effective 10/20/99, for all PI Incidents

form meets criteria for FORM FRA F 6180.98

Photograph #3

Rickey A. Jones, Jr. – Employee Personal Injury
August 15, 2002 – St. Albans, VT
**New England Central Railroad**
Photographs taken by Thomas Tozzer – August 16, 2000 – 8:20 A.M.



| DESCRIPTION: | Camera facing AL corner of SHPX 201016 |
|---|---|

| CAMERA USED: | UNKNOWN |
|---|---|
| FILM USED: | UNKNOWN |
| LENS: | UNKNOWN |

Photograph #4

Rickey A. Jones, Jr. – Employee Personal Injury
August 15, 2002 – St. Albans, VT
**New England Central Railroad**
Photographs taken by R. L. Ogden – August 21, 2002 – 11:00 A.M.



| | |
|---|---|
| DESCRIPTION: | Lead track Switch #9, looking west. |
| CAMERA: | CANON EOS REBEL G |
| FILM: | KODAK GOLD MAX 35 MM |
| LENS: | CANON 1:4-5.6 |

Photograph #5

Rickey A. Jones, Jr. – Employee Personal Injury
August 15, 2002 – St. Albans, VT
**New England Central Railroad**
Photographs taken by R. L. Ogden – August 21, 2002 – 11:00 A.M.



DESCRIPTION:        Lead track Switch #9, looking west.

CAMERA:             CANON EOS REBEL G
FILM:               KODAK GOLD MAX 35 MM
LENS:               CANON 1:4-5.6

Photograph #6

Rickey A. Jones, Jr. – Employee Personal Injury
August 15, 2002 – St. Albans, VT
**New England Central Railroad**
Photographs taken by R. L. Ogden – August 21, 2002 – 11:00 A.M.



| DESCRIPTION: | Camera located at Switch #9, looking south. |
|---|---|
| CAMERA: | CANON EOS REBEL G |
| FILM: | KODAK GOLD MAX 35 MM |
| LENS: | CANON 1:4-5.6 |

Photograph #7

Rickey A. Jones, Jr. – Employee Personal Injury
August 15, 2002 – St. Albans, VT
**New England Central Railroad**
Photographs taken by R. L. Ogden – August 21, 2002 – 11:00 A.M.



DESCRIPTION:    Camera located approximately 50 feet from Switch
                #9, looking northwest.


CAMERA:    CANON EOS REBEL G
FILM:      KODAK GOLD MAX 35 MM

LENS:      CANON 1:4-5.6

Photograph #8

Rickey A. Jones, Jr. – Employee Personal Injury
August 15, 2002 – St. Albans, VT
**New England Central Railroad**
Photographs taken by R. L. Ogden – August 21, 2002 – 11:00 A.M.



DESCRIPTION:            Camera located approximately 30 feet from Switch
                        #9, looking northeast.


CAMERA:                 CANON EOS REBEL G
FILM:                   KODAK GOLD MAX 35 MM

LENS:                   CANON 1:4-5.6

Photograph #11

Rickey A. Jones, Jr. – Employee Personal Injury
August 15, 2002 – St. Albans, VT
**New England Central Railroad**
Photographs taken by R. L. Ogden – August 21, 2002 – 11:00 A.M.



DESCRIPTION:          Camera located at Switch #9, looking southwest.


CAMERA:          CANON EOS REBEL G
FILM:             KODAK GOLD MAX 35 MM

LENS:             CANON 1:4-5.6

# EXHIBIT D

Photograph #1

Rickey A. Jones, Jr. - Employee Personal Injury
August 15, 2002 – St. Albans, VT
**New England Central Railroad**
Photographs taken by Thomas Tozzer – August 16, 2002 – 8:20 A.M.



DESCRIPTION:        Camera facing BL corner of SHPX 201016.

CAMERA USED:        UNKNOWN
FILM USED:          UNKNOWN
LENS:               UNKNOWN

Photograph #2

Rickey A. Jones, Jr. – Employee Personal Injury
August 15, 2002 – St. Albans, VT
**New England Central Railroad**
Photographs taken by Thomas Tozzer – August 16, 2000 – 8:20 A.M.



DESCRIPTION:          Camera facing left side of SHPX 201016


CAMERA USED:       UNKNOWN
FILM USED:             UNKNOWN
LENS:                       UNKNOWN